NAACP LEGAL DEFENSE & EDUCATIONAL FUND, INC., et al.

v.

Donald J. DEVINE, Director, United States Office of Personnel Management, Appellant.

No. 83–1822.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 17, 1983.

Decided Feb. 17, 1984.

As Amended Feb. 17, 1984.

Alfred R. Mollin, Atty. Dept. of Justice, Washington, D.C., with whom J. Paul McGrath, Asst. Atty. Gen., Stanley S. Harris, U.S. Atty., Washington, D.C. (at the time the brief was filed) and Anthony J. Steinmeyer, Atty., Dept. of Justice, Washington, D.C., were on the brief for appellant.

Charles Stephen Ralston, New York City, with whom James M. Nabrit III, New York City, Elaine R. Jones, Washington, D.C., Barry L. Goldstein, Brent Simmons, William L. Robinson, New York City, Norman J. Chachkin, Stuart J. Land, Boris Feldman, Robert T. Coulter, Walter B. Slocombe, M. Carolyn Cox and Douglas B. Jordan, Wash-

ington, D.C., were on the brief, for appellees.

Mozart G. Ratner and Allison Beck, Washington, D.C., were on the brief, for amicus curiae Intern. Ass'n of Machinists and Aerospace Workers, AFL–CIO, urging reversal.

Before WRIGHT, EDWARDS and STARR, Circuit Judges.

Opinion for the Court filed by Circuit Judge HARRY T. EDWARDS.

Dissenting Opinion filed by Circuit Judge STARR.

HARRY T. EDWARDS, Circuit Judge:

Charitable solicitation of Federal employees or military personnel at their workplaces or duty stations is conducted exclusively through an annual fund raising drive called the Combined Federal Campaign (the "CFC" or the "campaign"). On February 10, 1983, the Government issued an executive order excluding legal defense funds from future participation in CFCs. *See* Exec.Order No. 12,404, 48 Fed.Reg. 6,685 (1983). The NAACP Legal Defense and Educational Fund, Inc. ("NAACP LDF") and six other legal defense funds,[1] all recognized by the Government as lawful charitable organizations, brought suit arguing that the decision to exclude them from the CFC violated their First and Fifth Amendment rights. The District Court agreed and, by summary judgment, permanently enjoined Donald Devine, Director of the Office of Personnel Management ("OPM"), from excluding the appellees from participating in CFCs on the basis of Executive Order 12,404.

Because we find the exclusion of LDFs from the CFC to be patently capricious and unreasonable, we agree with the result reached by the District Court. We therefore affirm.

## I. BACKGROUND

### A. The Combined Federal Campaign

As the appellant has previously acknowledged, "[i]t has been long-standing policy of the Federal Government to cooperate with and assist voluntary health and welfare agencies in soliciting funds for worthy causes from Federal personnel." Memorandum from Donald J. Devine to David A. Stockman 1 (Oct. 22, 1981) (hereinafter "Devine Memo II"), *reprinted in* I Joint Appendix 70 (hereinafter "J.A."). Prior to the creation of the CFC, this policy was implemented essentially in an ad hoc manner: "[t]he heads of some Federal facilities permitted no solicitations whatsoever; at other Federal worksites, no restrictions were imposed, and it was not uncommon for a collection to be taken up each week on behalf of one charity or another." *Hearings Before the Subcomm. on Manpower and Housing of the House Comm. on Governmental Operations* 29 (1983) (statement of Donald J. Devine) (hereinafter "Devine testimony"), *reprinted in* II J.A. 397.

The early haphazard approaches to solicitations for charitable causes proved to be largely unsatisfactory. Charities "could not understand why they were allowed to solicit in some Federal establishments and not in others, nor did they appreciate the fact that some charities seemed to have the support of Federal management" while others did not. *Id.* Federal employees were sometimes confused or upset at being subjected to repeated solicitations. *Id.* The situation created an "intolerable administrative burden for Federal officials," Devine Memo II, *supra,* at 1, *reprinted in* I J.A. 70, as well as "an increasingly chaotic situation in Federal offices." Memorandum from Donald J. Devine to Craig L. Fuller 2 (Feb. 2, 1983) (hereinafter "Devine Memo III"), *reprinted in* I J.A. 107.

In 1961, "in order to control and simplify the process of charitable solicitation in the Federal workplace," President Kennedy

---

1. The other appellees in this action are: The Sierra Club Legal Defense Fund, Inc.; Puerto Rican Legal Defense and Education Fund, Inc.; Federally Employed Women Legal and Educa-tion Fund, Inc.; Indian Law Resources Center; The Lawyers' Committee for Civil Rights Under Law; and The Natural Resources Defense Council, Inc.

created the CFC. *Id.* He "directed that all ad hoc solicitations be ended, and that worthy charities be permitted to solicit in the Federal workplace through a single, annual drive combining all participating [charitable] agencies." Devine testimony, *supra,* at 29–30, *reprinted in* II J.A. 397–98. To implement this plan, President Kennedy issued Executive Order 10,927, instructing that arrangements be made "for such national voluntary health and welfare agencies and such other national voluntary agencies as may be appropriate to solicit funds from Federal employees and members of the armed forces at their places of employment or duty stations." Exec.Order No. 10,927, § 2(a), 3 C.F.R. 454 (1959–1963 Compilation).

The mechanics of the CFC have been described at length in other judicial opinions, *see NAACP Legal Defense and Educational Fund, Inc. v. Devine,* 560 F.Supp. 667 (D.D.C.1983) (*"NAACP LDF II"*); *NAACP Legal Defense and Educational Fund, Inc. v. Campbell,* 504 F.Supp. 1365 (D.D.C.1981) (*"NAACP I"*); therefore, we will highlight only those features that are necessary to understand the dispute at hand. The CFC is governed by the Director of the OPM, who makes all "basic policy, procedural, and eligibility decisions for the program." 5 C.F.R. § 950.201(a) (1983). Normally, there is bifurcated responsibility for the CFC drive in each participating locality. A designated private voluntary organization (the "Principal Combined Fund Organization" or "PCFO") "will raise money from Federal employees and administer the local campaign." *Id.* § 950.211(e). A local Federal coordinating committee oversees the PCFO, and is authorized to make decisions regarding administration of the local campaign (subject to those constraints imposed by the Director). *Id.* §§ 950.211(a), 950.509. The PCFO is reimbursed for its administrative expenses from the funds raised for the participating charities. *Id.* § 950.509(e); appellant's brief, p. 13.

Each local campaign consists of a "single, annual drive," conducted in the fall. 5 C.F.R. § 950.103(b), (c) (1983). The Federal agencies involved conduct their "own solicitation among [their] employees, using campaign materials, supplies, and speakers furnished by or through" the PCFO. *Id.* § 950.103(d). Federal employees are encouraged to participate in this and other CFC responsibilities undertaken by the Federal Government "to the extent consistent with Federal agency policy and prudent use of official time. They are encouraged also to devote private time to such volunteer work." *Id.* § 950.105.

An information leaflet is distributed to each potential contributor. *Id.* § 950.521(c). This leaflet is printed and supplied by the PCFO, *id.* § 950.521(a), and is accompanied by a brochure listing each charity (or "voluntary agency") approved for participation in the campaign and providing "a brief statement of about 30 words on [each charity's] programs." *Id.* § 950.521(e)(2)(i). The content of this statement is provided by the participating charities and/or the PCFO, subject to approval of the local Federal coordinating committee.[2]

Federal employees who choose to contribute can either (1) designate specific participating charities for receipt of the contribution or (2) make undesignated contributions. Undesignated contributions are pooled and deemed designated to the local PCFO, *id.* § 950.513(a), which can then distribute the funds "to any participant in the local CFC." 47 Fed.Reg. 29,497 (1982).

## B. *Exclusion of Legal Defense Funds From the CFC*

In 1980, the NAACP LDF and the Puerto Rican Legal Defense and Education Fund,

---

**2.** The appellant's brief indicates that PCFOs "prepare, print, and supply the contributor's leaflet." Appellant's brief, p. 12. It also acknowledges that participating charities will sometimes "provide a draft statement for inclusion in the leaflet," *id.* at 26, and indicates the appellant's "understanding that Federal officials managing local campaigns often approve the draft descriptive statements as they are submitted." *Id.* at 27 n. 21. It does not challenge the appellees' contention that "it is the participating charities that in reality draft their descriptions for the fundraising brochure." Appellees' brief, p. 10 (footnote omitted).

Inc. ("PR LDF") applied to participate in the CFC, but the Government refused this request, arguing that these LDFs did not provide *direct services* to persons in the fields of health and welfare services. *See* Appellant's brief, p. 6.[3] This exclusion was challenged in *NAACP I,* where the District Court agreed with the plaintiffs that the "direct services" requirement did "not have the precision necessary to comport with [the First Amendment's] requirements." 504 F.Supp. at 1368. The court also challenged the suggestion that the plaintiffs did not provide direct services to the needy, pointing out that:

> The record is replete with the results of plaintiffs' work, indicating that law suits by plaintiffs have provided millions of dollars in back pay and benefits, and invaluable other "services" such as increased training opportunities, additional promotions, improved school programs, and better hospital facilities. Apart from their litigation activities, each plaintiff also provides "direct services" through scholarship programs and education efforts.

*Id.*[4] The court enjoined the defendant from using the direct services requirement as a basis for rejecting pending or future applications from the plaintiffs, and encouraged the "government officials responsible for the program to re-examine the basic premises on which [the CFC] was established so that more acceptable standards [could] be developed." *Id.* at 1369.

In June 1981, the appellant circulated a memorandum discussing the *NAACP I* opinion and eligibility for the 1981 CFC. *See* Memorandum from Donald J. Devine to Department and Agency Fund-Raising Program Coordinators and Chairmen, Field Coordinating Groups (June 9, 1981) (hereinafter "Devine Memo I"), *reprinted in* I J.A. 52. In his review of so-called "borderline cases," Devine explained that while the imprecision of the "direct services" requirement had made it constitutionally infirm, he nevertheless found "some merit in the argument that these [legal defense funds do] not fall under Executive Order 10927." Despite the decision in *NAACP I,* Devine also persisted in contending that there is "logic to the direct vs. indirect services distinction." On this point, Devine argued that "[t]he difficulty is that the Manual does not define either of these criteria with the specificity required by the Court." *Id.* at 4, I J.A. 55.

Because more precise definitions had yet to be formulated, the memorandum concluded that the legal defense funds "must be allowed to participate in the present campaign," but added that this question was "among those that will be reviewed for the next campaign." *Id.* The memorandum also reported that "serious procedural questions have been raised regarding the eligibility" of the Planned Parenthood World-Population organization, but determined that "the facts presented are in doubt." *Id.* In discussing his decisions for the 1981 campaign, Devine offered that he had "come to the reluctant conclusion ... [that] it is probably too late in the planning process to make the wholesale revisions which are necessary" to bring the regulations "more in accord with the precision required by the First Amendment." *Id.* at 3, I J.A. 54. Adequate standards would, he assured, be promulgated for the 1982 campaign. *Id.* at 5, I J.A. 56.

In October 1981, the appellant sent a memorandum to David Stockman, the Director of the Office of Management and Budget. Devine Memo II, *supra, reprinted in* I J.A. 70. The subject of this memorandum was a proposed new executive order which, among other things, provided that to be eligible for the CFC, an organization

---

**3.** The "direct services" eligibility requirement was formalized in a Government manual which specified the procedures governing the CFC. Appellant's brief, p. 6.

**4.** The court independently held that the "direct services" requirement had substantially narrowed Executive Order 10,927 and, absent evidence that it was appropriate to exclude groups providing "'indirect services' or [operating] along general class lines," imposition of such a limitation was arbitrary and capricious. 504 F.Supp. at 1368.

could "not seek to influence . . . the determination of public policy . . . by litigating public policy in any court on behalf of any person other than itself." *Id.* at 9, I J.A. 78. The appellant argued that unless this and other proposed eligibility restrictions were adopted:

> [T]he inevitable result will be mandatory admission to the Combined Federal Campaign of a multitude of organizations whose programs, whatever their benefit in other ways, are considered less critical to the national interest than those directed at common human needs in the areas of health and welfare. Furnishing Federal administrative effort and indirect support to obtain contributions for programs of lower priority would clearly conflict with the thrust of the President's budget decisions to accord priority of Federal support to vital health and welfare programs.

*Id.* at 3, I J.A. 72.

The proposed executive order was not adopted prior to the 1982 campaign. Instead, on March 23, 1982, Executive Order 12,353 was issued, revoking Executive Order 10,927, but retaining its general eligibility standard allowing "appropriate" national voluntary agencies to participate in the CFC. Exec.Order No. 12,353, §§ 1, 9, 3 C.F.R. 139–40 (1982 Compilation). Pursuant to authority granted under the new executive order, the appellant promulgated comprehensive regulations to govern the 1982 campaign. These regulations defined

"national voluntary health and welfare agencies and such other national voluntary agencies as may be appropriate" in language that clearly included LDFs.[5] 5 C.F.R. § 950.101(a)(2), (3)(vii) (1983).[6]

Despite this official stance, there is no indication in the record that the appellant's opposition to LDF participation in the CFC, as expressed in the June and October 1981 memoranda, ever waivered. Indeed, the appellant has contended that LDFs were admitted into the CFC in 1981 and 1982 "with the hope of reducing the potential for further litigation." Devine testimony, *supra,* at 32, *reprinted in* II J.A. 400. *See also* Devine Memo III, at 7, *reprinted in* I J.A. 112 (indicating that "litigation is highly likely" to result from executive order excluding LDFs). On February 2, 1983, a memorandum from the appellant to Craig Fuller, Assistant to the President for Cabinet Affairs, implied that inclusion of LDFs in the CFC had been viewed as an impermanent approach, *id.* at 3–4, I J.A. 108–09, and argued that exclusion of LDFs was "urgently required." *Id.* at 8, I J.A. 113. This memorandum included a draft executive order which incorporated almost verbatim the appellant's October 1981 proposal to exclude LDFs. *Id.* at 9, I J.A. 114.

The February 2, 1983 memorandum offered somewhat different justifications for the proposed exclusions than those that had been voiced previously. First, it was claimed that "[m]any employees objected" to inclusion of—in the appellant's words—

---

5. "National voluntary health and welfare agencies and such other national voluntary agencies as may be appropriate" was defined to include national agencies that:

> (2) Are not "action" organizations within the meaning of 26 C.F.R. 1.501(c)(3)–1(c)(3) and are eligible to receive tax deductible contributions under 26 U.S.C. 170; and
> (3) Provide or substantially support one or more of the following services:
> . . . .
> (vii) Delivery of legal services to the poor and indigent, and defense of human and civil rights secured by law . . . .

5 C.F.R. § 950.101(a)(2), (3)(vii) (1983).

6. One of the major objections to the new regulations, when originally proposed in May 1982, *see* 47 Fed.Reg. 20,268 (1982) (to be codified at

5 C.F.R. § 950) (proposed May 11, 1982), had been that charitable organizations that serve women and minorities would be ineligible for the CFC because of criteria requiring that organizations "provide direct and substantial service throughout the country and in specific CFC locations." 47 Fed.Reg. 29,496 (1982). In the preamble to the final regulations the appellant indicated that objections regarding the eligibility of "legal defense, minority, and women's organizations" had persuaded OPM that some of its earlier criteria had been "overly restrictive," and consequently it had "modified both the general eligibility requirements and the direct and substantial presence criterion to meet most of the germane objections." *Id.* at 29,497.

"aggressive and controversial political and legal advocacy" groups. *Id.* at 4, 5, I J.A. 109, 110. He explained that "[s]everal unions organized boycotts of the CFC because of the participation of such groups as the Right to Work Legal Defense Fund." *Id.* at 4, I J.A. 109. The appellant argued that these protests jeopardized the CFC's fundraising objective, *id.*, and later warned that unless the campaign was reformed "devastating" employee boycotts "would bring the life of the Campaign to an end." Devine testimony, *supra*, at 6, *reprinted in* II J.A. 388. Second, the exclusion was justified by the impropriety of the Government's use of "taxpayer resources to raise funds for advocacy organizations and political education groups, however worthy or sympathetic may be their causes." *Id.* at 4–5, I J.A. 109–10. Finally, the appellant argued that because it was "becoming increasingly difficult to draw any lines and keep participation to a manageable number of organizations" the President had directed that the CFC be limited to "traditional health and welfare agencies." *Id.* at 5, I J.A. 110.

One week later, Executive Order 12,404 was issued. It enumerated the objectives of the CFC [7] and established new eligibility criteria. The new criteria are both inclusionary and exclusionary. The inclusionary provision specifies that participation in the CFC is limited to organizations that are considered "voluntary, charitable, health

and welfare agencies," and details at some length what this phrase encompasses.[8] The exclusionary provision stipulates that "[a]gencies that seek to influence the outcomes of elections or the determination of public policy through political activity or advocacy, lobbying, or litigation on behalf of parties other than themselves shall not be deemed ... eligible to participate" in the CFC. Exec.Order No. 12,404, § 1(b), 48 Fed.Reg. 6,685 (1983).

## C. The District Court Proceedings

Shortly after issuance of Executive Order 12,404, the appellees brought suit arguing that the order unconstitutionally excludes them from the CFC. The appellees relied on the First Amendment, and their right to equal protection under the law, and requested that the appellant be enjoined from excluding the appellees from the campaign.

In analyzing the appellees' claims, the District Court carefully distinguished between the appellees' interests in designated and undesignated contributions. The court held that when soliciting *designated* contributions "an organization seeks to persuade an employee to make a donation to that organization," and Government restrictions on this solicitation are constrained by the First Amendment. *NAACP Legal Defense and Educational Fund, Inc. v. Devine,* 567 F.Supp. 401, 406 (D.D.C.1983) (*"NAACP III"*). In contrast, control over the distri-

---

7. The objectives of the Combined Federal Campaign are to lessen the burdens of government and of local communities in meeting needs of human health and welfare; to provide a convenient channel through which Federal public servants may contribute to these efforts; to minimize or eliminate disruption of the Federal workplace and costs to Federal taxpayers that such fundraising may entail; and to avoid the reality and appearance of the use of Federal resources in aid of fund-raising for political activity or advocacy of public policy, lobbying, or philanthropy of any kind that does not directly serve needs of human health and welfare.
Exec. Order No. 12,404, § 1(b), 48 Fed.Reg. 6,685 (1983).

8. To meet these objectives, eligibility for participation in the Combined Federal Campaign

shall be limited to voluntary, charitable, health and welfare agencies that provide or support direct health and welfare services to individuals or their families. Such direct health and welfare services must be available to Federal employees in the local campaign solicitation area, unless they are rendered to needy persons overseas. Such services must directly benefit human beings, whether children, youth, adults, the aged, the ill and infirm, or the mentally or physically handicapped. Such services must consist of care, research or education in the fields of human health or social adjustment and rehabilitation; relief of victims of natural disasters and other emergencies; or assistance to those who are impoverished and therefore in need of food, shelter, clothing, education, and basic human welfare services.
*Id.*

bution of *undesignated* contributions is yielded to the CFC; such contributions are dedicated to the public good, and are not a response to the appeal of particular organizations. The lower court thus concluded that First Amendment rights are not implicated by restrictions on the distribution of undesignated contributions; such restrictions are "more properly the subject of an equal protection analysis." *Id.* Finding that the appellees' equal protection claim regarding undesignated contributions was not ripe, the lower court dismissed this portion of the appellees' suit. This dismissal is not appealed.[9]

However, the court held that excluding LDFs from the designated contribution portion of the CFC was unconstitutional. This decision was predicated on the court's finding that the CFC was a limited public forum. It reasoned that the CFC "permits numerous charitable organizations to present their messages to federal employees," *id.,* and "'the government has, in effect, provided a billboard or channel of communication through which organizations can disseminate their appeals to federal workers.'" 567 F.Supp. at 407 (quoting *NAACP I,* 504 F.Supp. at 1367). Moreover, because "Executive Order 10927 made no differentiation among charitable organizations on the basis of how they accomplish their objectives," the court held that the appellees did "fall within the limits of that forum as it historically has existed." *Id.*

The court then considered, and agreed with, the appellees' claim that the exclusion of LDFs from the CFC was a content-based prohibition on speech, which would only be justified by a compelling state interest. It reasoned that as the protected expression "in an act of charitable solicitation is a request for contributions, the 'content' of that expression is the accompanying statement of how those contributions will be used. It is this 'content' that has, according to defendant, engendered such controversy among potential contributors as to warrant

the exclusion based thereupon." *Id.* Finding that there was no compelling state interest to support the Government's position, the court enjoined the appellant from using Executive Order 12,404 to exclude legal defense funds from participating in CFCs. In particular, the court held that the Government's interest in excluding allegedly controversial groups from the forum was "an *impermissible* basis for a restriction upon speech." 567 F.Supp. at 408.

## II. DISCUSSION

### A. First Amendment Restrictions on Government Regulation of Access to the CFC

 Charitable solicitation indisputably involves speech interests "that are within the protection of the First Amendment." *Village of Schaumburg v. Citizens for a Better Environment,* 444 U.S. 620, 632, 100 S.Ct. 826, 833, 63 L.Ed.2d 73 (1980). *See also Heffron v. International Society for Krishna Consciousness, Inc.,* 452 U.S. 640, 647, 101 S.Ct. 2559, 2563, 69 L.Ed.2d 298 (1981); *National Black United Fund, Inc. v. Devine,* 667 F.2d 173, 178 (D.C.Cir.1981). While conceding this general proposition, the appellant posits that the CFC does not involve solicitation by the participating charities, and is more accurately described as a "subsidy" by the Federal Government. The appellant then argues that the Government's decision to restrict this subsidy to certain charities does "not implicate the First Amendment." Appellant's brief, p. 25.

 The appellant's description of the nature of the CFC flies in the face of uniform, and unequivocal, Government characterizations of the campaign over the past 20 years. In 1961, Executive Order 10,927 directed that arrangements be made for charitable organizations to "solicit funds" from Government employees, Exec. Order No. 10,927, § 2(a), 3 C.F.R. 454 (1959–1963 Compilation), and the two sub-

---

**9.** In *NAACP II,* 560 F.Supp. 667 (D.D.C.1983), the court held that denying two LDFs access to the undesignated funds raised in the CFC violated neither the First Amendment nor the Fifth Amendment.

sequent executive orders have contained similar mandates. *See* Exec.Order No. 12,-404, § 1(a), 48 Fed.Reg. 6,685 (1983) (Director "shall make arrangements for voluntary health and welfare agencies to solicit contributions from Federal employees ... at their places of employment or duty."); Exec.Order No. 12,353, § 1, 3 C.F.R. 139 (1982 Compilation) (same). The appellant has testified that President Kennedy's directive was "that worthy charities be permitted to solicit in the Federal workplace," Devine testimony, *supra,* at 3, *reprinted in* II J.A. 385, and even in this litigation, he has acknowledged that the CFC "permits traditional health and welfare charities to make a strictly limited appeal in the federal workplace." Defendant's Memorandum of Points and Authorities in Opposition to Plaintiffs' Motion for Summary Judgment, p. 40, *NAACP III,* 567 F.Supp. 401 (D.D.C. 1983).

This uniform characterization of the CFC as permitting charities to solicit is entirely consistent with the long-standing practices followed under the program. The Government has understandably imposed time, place, and manner restrictions to prevent disruption of its facilities by solicitation through the CFC. These restrictions have never been viewed as depriving the permitted solicitation of *any* First Amendment protections, and they surely have not converted "solicitations" into "subsidies." The CFC remains a limited, but critical, opportunity for charitable organizations to prepare and—with the support of the Government—disseminate their message to Federal employees. *See National Black United Fund, Inc.,* 667 F.2d at 179 ("The CFC clearly provides *some* charities with a substantial opportunity to publicize their views ....") (footnote omitted). In reaching this conclusion, which is in accord with the position taken by the lower court and every other court that has considered the question, we are adhering to the view we expressed in *National Black United Fund, Inc.*[10]

Because this case involves restrictions on First Amendment activity, it presents an entirely different question than that decided in the case cited by the appellant, *Regan v. Taxation With Representation,* —— U.S. ——, 103 S.Ct. 1997, 76 L.Ed.2d 129 (1983). In *Taxation With Representation,* the Court upheld a statute granting a tax exemption to certain nonprofit organizations that did not engage in substantial lobbying activities. In ruling that the First Amendment did not require Congress to extend this subsidy to the plaintiff's lobbying activities, the Court expressly pointed out that "[i]n this case ... Congress has not infringed any First Amendment rights or regulated any First Amendment activity." 103 S.Ct. at 2001.

Although it is obvious that the CFC does involve a minor element of "subsidization," it is equally clear that the CFC also involves the regulation of important First Amendment activity. While we are in agreement with the District Court's finding that the Government has undertaken a role in the CFC so that it can most effectively regulate, rather than subsidize, charitable solicitation of Federal employees, *see NAACP III,* 567 F.Supp. at 408, we need not reexamine this determination here. For even if

---

**10.** "[T]he written message in the CFC pamphlets ... advances protected speech and associational interests." 667 F.2d at 178. *See also NAACP I,* 504 F.Supp. at 1367 ("by providing organizations the opportunity to participate in the CFC, the government has, in effect, provided a billboard or channel of communication through which organizations can disseminate their appeals to federal workers. This process has proven extremely effective in raising charitable contributions. It is clear that the government must meet First Amendment strictures in its regulations concerning access to this channel of communication, which is, in fact, the only channel by which organizations can appeal to government employees at their workplace."); *National Black United Fund, Inc. v. Campbell,* 494 F.Supp. 748, 755 (D.D.C.1980) ("Through the Combined Federal Campaign the government has afforded a forum and platform where national voluntary agencies may advance their causes before federal employees and solicit for financial contributions.... Viewed in light of recent rulings there can be little dispute that the Combined Campaign involves First Amendment activities ...."), *rev'd on other grounds,* 667 F.2d 173 (D.C.Cir.1981).

we accepted the appellant's contention that subsidization is one purpose of the CFC, it is clear that this would not insulate the campaign from the commands of the First Amendment. Permitting public speech on Government property, in Government facilities, or in a forum such as the CFC, will often involve some quantum of Government subsidization, and yet there has never been the faintest suggestion in the case law that at some indeterminate level this causes the strictures of the First Amendment to dissipate. *See Perry Education Association v. Perry Local Educators' Association,* —— U.S. ——, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983) (use of intraschool mailing system); *Widmar v. Vincent,* 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981) (use of university facilities); *Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975) (use of public auditorium). While the costs incurred by the Government can certainly be relevant to the Government's interest in regulating access to public property for First Amendment activities, the Government's decision to incur such costs surely does not entirely remove such regulation from the purview of the First Amendment.

▌ While we reject the appellant's claim that the First Amendment is not even implicated in this case, we also recognize that "the First Amendment does not guarantee access to property simply because it is owned or controlled by the government." *United States Postal Service v. Council of Greenburgh Civic Associations,* 453 U.S. 114, 129, 101 S.Ct. 2676, 2685, 69 L.Ed.2d 517 (1981). As the Supreme Court has often indicated, "the State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated." *E.g., id.* In determining the degree of protection afforded by the First Amendment in this case, we are governed by the test articulated in *Perry Education Association,* —— U.S. ——, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983). *See generally* Cass, *First Amendment Access to Government Facilities,* 65 VA.L.REV. 1287 (1979); Kalven, *The Concept of the Public Forum: Cox v. Louisiana,* 1965 SUP.CT.REV. 1; Stone, *Fora Americana: Speech in Public Places,* 1974 SUP.CT.REV. 233; Note, *A Unitary Approach to Claims of First Amendment Access to Publicly Owned Property,* 35 STAN.L.REV. 121 (1982).

In *Perry,* the Court considered a rival union's challenge to a collective bargaining provision between a school district and the teachers' exclusive bargaining representative. The provision stipulated that the bargaining representative, but no other union, would have access to the interschool mail system and teacher mailboxes in the district's schools. In evaluating the rival union's claim that this restriction violated its First Amendment rights, the Court distinguished three types of public property:

(1) *Traditional Public Forums.* "At one end of the spectrum" is property such as streets and parks, which by tradition has " 'been held in trust for the use of the public, and, time out of mind, [has] been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.' " 103 S.Ct. at 954–55 (quoting *Hague v. Committee for Industrial Organization,* 307 U.S. 496, 515 [59 S.Ct. 954, 964, 83 L.Ed. 1423] (1939)). In these forums, communicative activity cannot be entirely prohibited, and content-based exclusions will be sustained only if the Government shows they are necessary to serve a compelling state interest and are narrowly drawn to achieve that end. *Id.* [103 S.Ct.] at 955. Content-neutral regulations of time, place, and manner of expression can also be enforced if they are narrowly tailored to serve a significant Government interest, and if ample alternative channels of communication are left open. *Id.*

(2) *Limited Public Forums.* Public property "which the state has opened for use by the public as a place for expressive activity," *id.,* may constitute a limited public forum. Although the state may not have been required to create this forum originally, and "is not required to indefinitely retain the open character of the facility, as long as it does so it is

bound by the same standards as apply in a traditional public forum." *Id.*

(3) *Public Property that is Neither a Traditional Nor a Limited Public Forum.* "Public property which is not by tradition or designation a forum for public communication is governed by different standards." *Id.* On this property, the Government may impose time, place, and manner regulations, and also "may reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *Id.*

In applying this tripartite analysis to the facts in *Perry,* the Court held that the school mail facilities fell within the third (nonpublic forum) category. *Id.* The Court explained that there was no evidence indicating that permission had been granted "as a matter of course" to all who sought to distribute material; although selective access had been permitted to groups "such as the YMCA, Cub Scouts, and other civic and church organizations," this was not sufficient to "transform government property into a public forum." *Id.* at 956. Independently, the Court held that even assuming that this selective access had transformed the property into a limited public forum, the constitutional right of access would "extend only to other entities of similar character." As the purposes of the rival union's communications were entirely different than those of the civic organizations that had been permitted access, the rival union was not encompassed by the limited forum. *Id.*

In the instant case, the parties have debated at length the correctness of the lower court's holding that the CFC is a "limited public forum." In our view it is unnecessary to decide this question. Even in forums falling within the third (nonpublic forum) category identified in *Perry,* the First Amendment imposes constraints on the Government's right to allow access to some speakers while denying it to others. "The touchstone for evaluating" a differential access policy by the Government is whether the distinctions relied on by the Government "are reasonable in light of the purpose which the forum at issue serves." *Perry,* 103 S.Ct. at 957 (footnote omitted). Because our subsequent discussion reveals that the exclusion of LDFs does not satisfy this reasonableness standard, we do not decide whether the test used in cases involving limited public forums is applicable.[11]

## B. Application of the Reasonableness Test to Differential Treatment of Like Speakers

In *Perry,* the Supreme Court held that the school district's differential access policy satisfied the reasonableness standard applicable to public property falling within the third (nonpublic forum) category. In reaching this conclusion, the Court emphasized that the district's differential access policy was "based on the *status* of the respective unions rather than their views." 103 S.Ct. at 957. The Court explained that a bargaining representative "has official duties as representative [of the district's] teachers." Id. at 958 n. 10. Use of the school mail facilities enabled the bargaining representative to perform these duties effectively. Id. at 958. In essence then, the district had simply restricted use of the

---

11. There is some question about whether the forum in this case is the Federal workplace or the CFC itself. Although the appellant's argument that the workplace is the forum finds some support in *U.S. Southwest Africa/Namibia Trade & Cultural Council v. United States,* 708 F.2d 760 (D.C.Cir.1983), the Supreme Court's analysis of school mail box facilities as a forum, *see Perry,* 103 S.Ct. at 955—as opposed to the school itself—suggests that the CFC is the relevant forum. Although we therefore will refer to the CFC as the forum at issue, this differentiation has little impact on our analysis because we assume, without deciding, that the forum is within *Perry*'s third category. In assessing the reasonableness of restrictions in such a forum, it is proper to consider Government interests in preventing disruption of the environment in which the forum is located—in this case, the Federal workplace. *See id.* at 959 (Government could restrict access to school mail facilities to "insur[e] labor-peace within the schools").

mail system "to those who participate[d] in the forum's official business," *id.* at 959 (footnote omitted)—a restriction that was permissible "without further justification." *Id.* The Court also found that the exclusion of a rival union was reasonable because of the need to insure "labor-peace within the schools," *id.* (footnote omitted), and because "substantial alternative channels [remained] open for union-teacher communication to take place." *Id.* Finally, the Court considered, but ultimately rejected, the rival union's suggestion that the district's policy was overinclusive and underinclusive. *Id.* at 959 n. 13.

In this case, we also must evaluate a differential access policy adopted by the Government. While the Government has granted hundreds of charities access to the CFC, the Government has expressly denied access to the appellees and other LDFs. In one essential respect, however, this case is strikingly different from *Perry:* there is no discernible difference in the *status* of the appellees and that of the organizations which have been permitted access to the CFC.

In contrast to *Perry,* this is not a case in which access has been restricted to those engaged in the forum's official business— both the included charities and the appellees wish to engage in charitable solicitation through the CFC. Aside from this obvious equivalence, there are other manifest and substantial similarities between the included charities and the appellees. Like the included charities, the appellees are charitable organizations within the meaning of section 501(c)(3) of the tax code. 26 U.S.C. § 501(c)(3) (1976). It is also undisputed that the appellees are not engaged in political activities which are inconsistent with this charitable status. *See generally id.;* 26 C.F.R. § 1.501(c)(3)–1(c)(3) (1983). Equally clear is the fact that the appellees and the included charities share the traits that have traditionally been considered critical in determining eligibility for the CFC: all provide and support "direct health and welfare services."

In *NAACP I,* the court held that an attempt to exclude two of the appellees from the CFC on the ground that they did not provide "direct services" was constitutionally infirm. By the same token, it cannot seriously be argued that the appellees do not "provide or support direct health and welfare services to individuals or their families" within the meaning of Executive Order 12,404. The appellees provide and support such services by furnishing legal assistance, by seeking judicial enforcement of the common law, statutory and constitutional rights of their clients, and by obtaining health and welfare benefits for the needy. Indeed, because the Government has included groups such as the National Parks and Conservation Association, the United States Olympic Committee, the Wilderness Society and the National Recreation and Park Association in the CFC, *see* Memorandum from Donald J. Devine to Chairmen and Chairwomen, Federal Coordinating Committees, National Voluntary Agencies, and Federated Groups 4 (Aug. 20, 1982), *reprinted in* II J.A. 551, a strong argument can be made that the appellees more closely comport with the standard established by the Government than do some of the included charities. In short, both in terms of their longstanding treatment under the tax code, and the parameters of the CFC as it has traditionally been understood, the status of the appellees and the included charities is virtually identical.

The Government's decision in 1983 to add an exclusionary clause to bar LDFs from the CFC obviously does not affect this conclusion. If the LDFs are generally of the type included in the campaign—and the preceding analysis indicates that they are— the Government cannot simply manufacture a difference in status by adding a specific exclusionary clause. Were this not the case, any charity could gain a "different" status from the others—regardless of their substantive similarities—for each is susceptible to categorization within a class of charities (*e.g.,* organizations providing food aid; organizations studying cancer) that could be targeted for exclusion by the Government.

The similarities between the appellees and the included charities make the Government's differential access policy in this case far more troublesome than the policy considered in *Perry.* By permitting hundreds of charities to solicit through the CFC, the Government has plainly evidenced its view that such solicitation is not antagonistic to its interests nor inconsistent with the normal activities in the Federal workplace. On the contrary, it is clear that the Government views this charitable solicitation as highly worthwhile. Nevertheless, the Government has also chosen to forbid the same solicitations by similarly situated charities. Such differential treatment of like entities raises the serious possibility that a speaker, or class of speakers, has been excluded from a forum, not in furtherance of a legitimate interest of the Government, but instead simply because the speaker has been viewed disfavorably by the Government. *Cf.* Karst, *Equality as a Central Principle in the First Amendment,* 43 U.Chi.L.Rev. 20, 36–41 (1975) (discussing "hidden" techniques for content discrimination in public forums).

■ The factual distinction between this case and *Perry* therefore makes it essential that we examine with some care the Government's claim that its differential access policy satisfies the requirement of reasonableness established by *Perry.*[12] In assessing the reasonableness of differential treatment of similarly situated speakers, we must consider whether the Government's discriminatory policy is related to, and in furtherance of, a legitimate Government interest, and whether the asserted interest adequately explains why some speakers have been permitted access, while others have been denied it. We must also be circumspect in evaluating conclusory statements by Government officials which do not comport with either the evidence in the record or common sense. In undertaking this review, we emphasize the narrow scope of our holding: the inquiry that we have delineated is demanded by the similarities

between the included and excluded charities in this case; we in no way suggest that this inquiry is appropriate in situations, such as that reviewed in *Perry,* which involve differential treatment of speakers who are not similarly situated.

### C. The Unreasonableness of Excluding LDFs From the CFC

One point that is noteworthy about the Government's opposition to the inclusion of LDFs in the CFC is that the official explanations for this opposition have vacillated substantially over the past three years. Although this vacillation may be cause for suspicion, we nonetheless have accepted the various explanations at face value and have carefully considered each asserted justification for the Government's differential treatment of similarly situated charities in this case. Pursuant to this examination, we conclude that none of the Government's explanations satisfy the reasonableness test explicated in *Perry.*

#### 1. Assistance to the Needy

The justification most consistently offered by the Government is its claim that exclusion of LDFs is a critical means of restricting participation in the CFC to "those charities which assist those who are most in need." Appellant's brief, p. 32. However, the appellant's suggestion that access to the CFC is somehow restricted to organizations whose programs "are aimed directly at the needs of the poor, the infirm, the hungry, and the truly needy," Office of Personnel Management News Release 1 (Feb. 10, 1983), *reprinted in* I J.A. 25, is patently ludicrous in view of the wide range of organizations included in the CFC. Although the programs of organizations like the United States Olympic Committee may be laudable, the Government certainly cannot explain the inclusion of such organizations and the exclusion of LDFs on this ground. Indeed, in defending Executive Order 12,404, the appellant told a congressional committee that "sports associations"

---

**12.** Because we find that the Government's exclusion of LDFs is unreasonable, we need not

address the appellees' argument that such exclusion is a viewpoint-based regulation.

and "recreation societies" had never been considered appropriate for inclusion in the CFC because "they were not engaged in supplying health and welfare services directly to human beings who were ill, infirm, poor, or distressed." Devine testimony, *supra,* at 30–31, *reprinted in* II J.A. 398–99.

In contrast to the activities of some organizations that the appellant ultimately *did* include in the CFC, the undisputed evidence in the record reveals that as a result of the NAACP LDF's litigation efforts, primarily on behalf of low income blacks, "hundreds of thousands of persons have received direct benefits, such as income supplementation in the form of back pay and future earnings, better educations, improved health care, better housing and other living conditions, humane conditions of incarceration and, in the case of our capital punishment program, life itself." Affidavit of Jack Greenberg, Director-Counsel of the NAACP LDF 6 (Nov. 25, 1980), *reprinted in* I J.A. 130.[13]

### 2. *Political Advocacy*

The appellant has also argued that exclusion of LDFs from the CFC is necessary because they are political advocacy groups, and the Government has a legitimate interest in avoiding the appearance of Federal support for such groups. Appellant's brief, p. 36. While we agree that this is a legitimate interest, it is not advanced by excluding LDFs from the CFC. As we have indicated, LDFs are not considered political action groups under the tax code. By providing tax exemptions to such organizations the Government has already resolved any questions concerning allegations of political advocacy by the LDFs. There is no indication that the Government ever saw a need to deviate from the tax code definition prior to the issuance of Executive Order 12,404— to the contrary, the regulations preceding Executive Order 12,404 expressly adopted the tax code's definition of a political action group. *See* 5 C.F.R. § 950.101(a)(2) (1983)

(limiting eligible charities to those that "[a]re not 'action' organizations within the meaning of 26 C.F.R. § 1.501(c)(3)–1(c)(3) and are eligible to receive tax deductible contributions under 26 U.S.C. 170").

In fact, at no point in these proceedings, or in the documents included in the record, has the appellant provided a plausible explanation of why LDFs are properly characterized as political advocacy groups. The *only* distinction proffered by the Government between legal aid societies (which are included in the CFC) and LDFs is that the LDFs "are selective of clients on the basis of whether or not they have a cause, claim, or defense" that the LDF wishes to advance, Affidavit of Joseph A. Morris, General Counsel of the OPM 3 (Apr. 12, 1983), *reprinted in* II J.A. 433. But this surely cannot be the basis for considering LDFs political advocacy groups. While the participating charities—as well as the LDFs— share the common trait of providing health and welfare services, many of these organizations have chosen to focus on a particular facet of this extensive area. Whether this focus is on a particular group (*e.g.,* war veterans) or a particular need (*e.g.,* housing), this decision obviously does not turn a group into a political advocacy organization.

As the inclusion of legal aid societies in the CFC demonstrates, the fact that a group undertakes litigation seeking judicial enforcement of common law, statutory, and constitutional rights also does not make its activities impermissibly political. We think it equally clear that an organization's view that it can aid the greatest number of individuals by pursuing relief for a class of individuals cannot be said to "politicize" its activities. *See generally* Affidavit of M.D. Taracido, President of PR LDF 2 (Nov. 25, 1980), *reprinted in* II J.A. 310 ("[I]t has been the judgment of PRLDEF that, with only six full time staff attorneys, its efforts would serve and benefit a far greater number of people through the vehicle of class

---

13. The affidavits in the record provided by representatives of the other appellees in this action are replete with descriptions and illustrations of their efforts to obtain judicial *enforce-*

*ment of laws* designed to protect and aid the needy, as well as laws protecting the health of society by promoting a clean environment.

action litigation than by litigation solely on behalf of individuals."). Moreover, because both legal aid societies and LDFs typically litigate individual actions and class actions, this consideration would not justify including the former in the CFC while excluding the latter.

Inevitably, many of the charities participating in the CFC will have identifiable philosophies. Nevertheless, as their treatment in the tax code demonstrates, this is neither inherently inconsistent with their charitable status nor does it invariably require that the Government deny them access to any Government facility. *Cf. Widmar v. Vincent,* 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981) (use of university facilities by student religious group); *U.S. Southwest Africa/Namibia Trade & Cultural Council v. United States,* 708 F.2d 760, 771–72 (D.C.Cir.1983) (political advertisements at public airport did not create appearance of Government support for, or endorsement of, the message advertised).

### 3. The Claim That LDF Participation Would Be Controversial

We next consider the appellant's claim that LDFs were excluded from the CFC because their participation was controversial. In his October 1981 memorandum, Dr. Devine revealed his staunch opposition to LDFs before there was any suggestion that their participation in the CFC might prove controversial. His more recent explanations for their exclusion have emphasized the need to minimize controversy. He argues that many employees opposed their participation in the 1981 and 1982 campaigns, and that individuals and unions threatened to—and did in fact—boycott the CFC.[14]

The appellant's suggestion that LDFs were excluded from the CFC to pacify protesting employees is an extremely disturbing notion when considered in the light of First Amendment protections. The growth of our nation has not been accomplished by suppressing ideas or speakers that we find distasteful. *See Bridges v. Wixon,* 326 U.S. 135, 166, 65 S.Ct. 1443, 1458, 89 L.Ed. 2103 (1945) (Murphy, J., concurring).[15] To allow the intolerance (and threats) of a vocal minority (or even the majority) to determine who shall and shall not speak "would lead to standardization of ideas," *Terminiello v. Chicago,* 337 U.S. 1, 4, 69 S.Ct. 894, 93 L.Ed. 1131 (1949), and would "fictionaliz[e] the *rationale* of the First Amendment." Note, *Constitutional Law—Free Speech and the Hostile Audience,* 26 N.Y.U.L.REV. 489, 491 (1951) (footnote omitted). *See also West Virginia State Board of Education v. Barnette,* 319 U.S. 624, 638, 63 S.Ct. 1178, 1185, 87 L.Ed. 1628 (1943) ("The very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts."). This concern has long been reflected in our jurisprudence, and we have been loath to prohibit speech "merely because the ideas are themselves offensive to some of their hearers." *Street v. New*

---

**14.** The appellant has wisely chosen not to press the suggestion that exclusion of controversial groups is necessary to protect a captive audience. *See Bolger v. Youngs Drug Products Corp.,* —— U.S. ——, 103 S.Ct. 2875, 2883, 77 L.Ed.2d 469 (1983) ("we have never held that the government itself can shut off the flow of mailings to protect those recipients who might potentially be offended.... Recipients of objectionable mailings ... may 'effectively avoid further bombardment of their sensibilities simply by averting their eyes.' Consequently, the 'short, though regular, journey from mail box to trash can ... is an acceptable burden, at least so far as the Constitution is concerned.' ") (citations omitted); *Consolidated Edison Co. v. Public Service Comm'n,* 447 U.S. 530, 542, 100

S.Ct. 2326, 2336, 65 L.Ed.2d 319 (1980); *U.S. Southwest Africa/Namibia Trade & Cultural Council v. United States,* 708 F.2d 760, 767 (D.C.Cir.1983).

**15.** For discussions of the First Amendment problems raised by the hostile audience, see H. KALVEN, THE NEGRO AND THE FIRST AMENDMENT 140–60 (1965); McGaffey, *The Heckler's Veto: A Reexamination,* 57 MARQ.L.REV. 39 (1973); Note, *Freedom of Speech and Assembly: The Problem of the Hostile Audience,* 49 COLUM.L. REV. 1118 (1949); Note, *Hostile-Audience Confrontations: Police Conduct and First Amendment Rights,* 75 MICH.L.REV. 180 (1976).

*York,* 394 U.S. 576, 592, 89 S.Ct. 1354, 1366, 22 L.Ed.2d 572 (1969). Indeed, the Supreme Court has observed that "[t]he right to speak freely and to promote diversity of ideas *and programs* is . . . one of the chief distinctions that sets us apart from totalitarian regimes." *Terminiello,* 337 U.S. at 4, 69 S.Ct. at 895 (emphasis added).

For the reasons we have already expounded, opposition to including LDFs in the CFC cannot be explained by relevant differences between LDFs and the charities included in the campaign. Nor has the opposition been aroused by the inflammatory nature of the LDFs' speech. Whittled to its core, the appellant's argument therefore is simply that when some ill-defined faction in an audience threatens to withhold charitable contributions *for any reason,* this threat of withholding is sufficient justification for suppression of speech. History unmistakably informs us that the principal victim of this type of censorship is the unpopular minority—be it religious, racial, political, or some other. *See* McGaffey, *The Heckler's Veto: A Reexamination,* 57 MARQ. L.REV. 39, 39 (1973).

Allowing such considerations to become the touchstone for regulating First Amendment speech leaves First Amendment liberties subject to the whim of the listener. It also provides Government officials hostile to the interests of a speaker a ready excuse for restricting these liberties. The Supreme Court has said in another context that "one man's vulgarity is another's lyric." *Cohen v. California,* 403 U.S. 15, 25, 91 S.Ct. 1780, 1788, 29 L.Ed.2d 284 (1971). Much the same can be said of attempts to identify the "controversial" speaker—what is controversial to some, may seem perfectly natural to others. Is the Government to determine which speakers are unacceptably controversial by counting letters of protestation, or should its unverified suspicion that a speaker will cause "ill feelings" between workers suffice? *See* appellant's brief, p. 36. Earlier litigation involving the CFC, in which Director Devine was ultimately required to include Planned Parenthood in the CFC, starkly illustrates the

danger entailed by blithe acceptance of such Government determinations:

> Throughout the prolonged investigation of Planned Parenthood, defendant has stated no specific reason for the extra attention now focused on this agency, aside from the suggestions, without noted evidence supporting them, that financial problems exist and that this is a "controversial" agency. At the eligibility hearing on September 2 defendant stated his own views of Planned Parenthood as follows:
>
>> Everyone knows where I [Director Devine] stand in regard to the kind of practices that Planned Parenthood does. You promote abortions; I think that's detestible (sic). I think in a just world you'd have nothing to do with a charitable drive.
>
> Indeed, the controversial nature of this organization and the vocal opposition of pro-life groups appear to be either the primary factor delaying a decision, or a paramount consideration in that delayed decision.

*Planned Parenthood Federation of America, Inc. v. Devine,* No. 83–2118, order at 3–4 (D.D.C. Sept. 14, 1983) (order providing that if defendant failed to issue a decision with cogent reasons resolving application of plaintiff by 3:00 p.m. on September 14, plaintiff would automatically be approved for participation in the CFC).

These considerations compel us, at a minimum, to examine very carefully the appellant's suggestion that a differential access policy for the CFC is justified by the Government's interest in excluding so-called controversial groups. Because this examination reveals the frailty of the appellant's claim on the facts of this case, we need not go as far as the lower court and decide whether the controversial nature of a speaker is in all cases an *impermissible* basis for restricting speech on public property.

In evaluating the appellant's claim, we again emphasize that this appeal involves only that portion of the CFC *in which employees choose* to designate their contributions to specific charities. The Govern-

ment's role in the CFC facilitates a broad and informed choice by employees interested in making charitable contributions. As long as it is the employees that ultimately decide who they will support, the addition of brief statements by LDFs to a leaflet that already includes hundreds of statements should not engender significant protest.

It should also be understood that the access sought in this case is quite unlike that examined by the Supreme Court in *Greer v. Spock,* 424 U.S. 828, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976). In *Greer,* the Court had to consider the lawfulness of a military authority's decision to prevent certain Presidential and Vice Presidential candidates from *making speeches,* and other plaintiffs from *distributing literature,* on a military reservation. In upholding the regulation on which the latter prohibition was based, the Court said that:

> [I]t is to be emphasized that [the regulation] does not authorize the Fort Dix authorities to prohibit the distribution of conventional political campaign literature. The only publications that a military commander may disapprove are those that he finds constitute "a clear danger to [military] loyalty, discipline, or morale," and he "may not prevent distribution of a publication simply because he does not like its contents," or because it "is critical—even unfairly critical—of government policies or officials ...."

*Id.* at 840, 96 S.Ct. at 1218 (footnote omitted). Justice Powell's concurrence further explained that "[a]lthough the recruits [on

the reservation] may be exposed through the media and, perhaps, the mail to all views in civilian circulation, *face-to-face persuasion* by someone who urges, say, refusal to obey a superior officer's command, has an immediacy and impact not found in reading papers and watching television." *Id.* at 849, 96 S.Ct. at 1223 (Powell, J., concurring) (emphasis added).

In the instant case, there is no plausible reason to suspect that the limited and unobtrusive communications at issue will in any way interfere with the normal activities in the workplace. Workers frequently have some exposure to ideas that may prove controversial, but their normal reaction certainly is not to discontinue the work they are being paid to perform. Should they do so, they can be reprimanded or otherwise disciplined. Absent any tangible evidence in the record suggesting that some real and serious disruptions of the workplace will likely occur, we are unwilling to defer to the fanciful—and somewhat specious—speculations offered by the appellant.[16]

Nor are we persuaded by the appellant's suggestion that inclusion of LDFs imperils the fund-raising purposes of the CFC. Although some unions protested the inclusion of one particular LDF in the campaign, the record indicates that these unions encouraged members either to simply *designate* the charities they wished to support, *see* Statement of AFL–CIO Executive Council 2 (Aug. 4, 1982), *reprinted in* I J.A. 97, or to "give *directly* to causes that we have traditionally supported and that have supported us." Letter from International Association of Machinists and Aerospace Workers to

---

**16.** In *Perry,* the Supreme Court recognized that disruption of the workplace would be highly likely if an employer was required to allow a *rival* union access to the school mail system so that it could challenge a lawfully certified union. Not only would the *rival* status of the unions create serious problems, but the continuing presence in the workplace of an *unrecognized* union would be wholly at odds with the system of "exclusive representation" that is uniformly recognized in collective bargaining in this country.

There are no such plausible assertions that may be advanced in the instant case. Not only does the record fail to support the suggestion that work was disrupted when LDFs partici-

pated in the CFC in 1981 and 1982, the fear of such disruption is completely counterintuitive. Assertions of workplace disruption resulting from First Amendment activities can often be made, and almost inevitably will be made when speech critical of the Government is involved. Cass, *First Amendment Access to Government Facilities,* 65 Va.L.Rev. 1287, 1334 (1979). Unquestioning acceptance of such arguments would turn "workplace disruption" into "a shibboleth, the mere recitation of which dictates constitutionality." *Frontiero v. Richardson,* 411 U.S. 677, 690, 93 S.Ct. 1764, 1772, 36 L.Ed.2d 583 (1973) (discussing assertions of "administrative inconvenience").

Grand Lodge Representatives, *et al.* (Aug. 18, 1982), *reprinted in* I J.A. 93 (emphasis added). Moreover, as long as all employees are permitted to *choose* which groups they will contribute to, providing employees a broad range of groups to choose among may encourage, rather than discourage, employee contributions. The undisputed evidence in the record reveals that substantial numbers of employees chose to contribute to LDFs, *see, e.g.,* Affidavit of Emanuel Owens, Coordinator of NAACP LDF's Combined Federal Campaign 8–9 (Mar. 1983), *reprinted in* II J.A. 302–03 (indicating that NAACP LDF received at least $170,000 through CFC in 1981–82); Report of Capital Area CFC (Mar. 2, 1983), *reprinted in* I J.A. 105 (indicating that among the 41 national service agencies listed, the Sierra Club LDF received the fourth highest percentage of designated contributions, and the NAACP LDF received the seventh highest), and that there was a 3.8% *increase* in funds raised by the 1982 CFC, Affidavit of P. Kent Bailey, Program Analyst, OPM 2 (June 30, 1983), *reprinted in* II J.A. 553, in spite of the "declining [size of the] federal work force." Letter from Jack Greenberg to President Reagan 1 (Jan. 11, 1983), *reprinted in* I J.A. 101.[17]

Hence, the record does not support the appellant's claim that the Government acted reasonably in excluding LDFs from the campaign to appease employees opposed to their inclusion. It should also be noted that the appellant's protestations of concern about controversial eligibility decisions is tellingly rebutted by his treatment of charities providing family planning services. As we have indicated, the appellant resisted inclusion of Planned Parenthood in the campaign, ostensibly on the ground that its participation was controversial. However, participation by the Moral Majority Foundation, Inc., was allowed even though its activities include providing educational services with respect to abortion counseling.[18] One can hardly envision decisions more likely to lead to outcries of "politicization" and demands for boycotts of the campaign. The Government cannot simply "pick and choose" its controversies as a means to restrict speech by those it views disfavorably. On the facts of this case, the appellant's claim—that the alleged controversial nature of LDFs justifies denying them the same opportunity to communicate permitted similarly situated charities—must be rejected as wholly unreasonable.

### 4. Restricted Access to Avoid Undue Burdens on the CFC

The final rationale asserted by the appellant is the need to avoid innundation of the

---

**17.** The appellant's suggestion that the inclusion of controversial groups necessitated "extraordinary exertions" by Federal officials conducting the CFC, is wholly unpersuasive as a justification for excluding LDFs. Generally, Federal employees are only encouraged to participate actively in the work of voluntary agencies in the CFC "to the extent consistent with Federal agency policy and prudent use of official time," 5 C.F.R. § 950.105 (1983), although one or more Federal executives may be "loaned" to work on a local CFC. *Id.* § 950.509(k). The appellant has not claimed that the controversial nature of the CFC required additional personnel to be assigned to its management, nor has he made any attempt to provide even the roughest approximation of the extra efforts which allegedly were required.

In fact, the record indisputably indicates that the concern raised by the appellant is merely a post hoc rationalization for the exclusion of LDFs. Although in the proceedings below the appellant's briefings made some vague references to "workplace disruption," it was never suggested that the efforts required of Federal personnel justified exclusion of LDFs, or that they played any part in the Government's decision to exclude LDFs. Similarly, neither the appellant's February 1983 memorandum, nor his subsequent testimony, even argue that the alleged extra efforts required by the inclusion of LDFs were so substantial that they justified exclusion of LDFs. The only evidence cited in the appellant's argument on this point on appeal, is a statement in the preamble to new regulations proposed in June 1983, *see* 48 Fed. Reg. 29,458 (1983)—a statement made by OPM well after this litigation had been commenced.

**18.** The appellees' brief indicates that the Moral Majority Foundation was included in the 1983 campaign, appellees' brief, p. 40 n. 72; *see also* 1984 Combined Federal Campaign of the National Capital Area, 1984 Combined Federal Campaign Agency Listing 2 (1983), and this point has never been challenged by the appellant. It was raised at oral argument and again was not disputed.

CFC. Absent some reasonable *distinction* between LDFs and the included charities, however, this consideration cannot possibly justify the Government's differential access policy. If the Government is required to limit the access of charities that it cannot meaningfully distinguish, it must allocate spots in the CFC between these charities in some even-handed manner, see, e.g., *Heffron v. International Society for Krishna Consciousness, Inc.,* 452 U.S. 640, 649, 101 S.Ct. 2559, 2565, 69 L.Ed.2d 298 (1981) ("first-come, first-served system"), rather than arbitrarily identifying LDFs for exclusion. Additionally, the appellant has recently acknowledged that this Government interest is not furthered in any noticeable way by exclusion of LDFs:

> I do not suspect that many groups that are presently eligible for the campaign would not be eligible under our proposal.... [T]here will be very little impact in terms of numbers on those eligible.... It is going to have an impact [on the number of charities], but in terms, let's say, of 500 in the Washington, D.C. area, we may be talking about ten or something like that, and in terms of percentage in it would be very small.

Devine testimony, *supra,* at 44–45, *reprinted in* II J.A. 412–13.

### 5. Alternative Forums

Finally, we need not consider at great length any claims made regarding the alleged availability of alternative forums to the appellees. In a society that cherishes freedom to speak, deprivation of a particular forum typically will not leave the speaker without *any* opportunity to communicate. It is therefore not surprising that the availability of alternative forums has never been considered to justify Government attempts to "pick and choose" among preferred speakers. To allow such a justification would be to nullify important rights of free speech.

The LDFs have every right to seek access to the CFC once the Government makes the forum available to other like charities and offers no reasonable explanation for the exclusion of LDFs. It is hardly surprising that the LDFs have challenged their exclusion from the CFC. Effective charitable solicitation depends on economical and efficient means to communicate one's message to mass audiences. The CFC is the *exclusive* forum for charitable solicitation in the Federal workplace, and the undisputed evidence in the record indicates that it is a critical medium for making charitable appeals to Federal employees.[19]

The principal point here, however, is not that the CFC is an effective forum for solicitation; the same result that we reach today would hold even if it could be shown that the CFC produced relatively little by way of contributions for LDFs. The principal point in this case is that, in the absence of any reasonable ground for making the CFC forum available to charities like LDFs but not to LDFs, the restriction challenged by the appellees violates the First Amendment.

### A POSTSCRIPT IN RESPONSE TO THE DISSENT

█ In affirming the District Court's opinion, we have been guided by a fundamental, yet hardly earthshaking, proposition: the First Amendment does not permit the Government to differentiate between similarly situated speakers in regulating speech on public property, unless there is some reasonable basis for this differentiation. This limitation on the Government's right to discriminate *unjustifiably* between like speakers, in no way imperils the Government's power to insist reasonably on order within its facilities. It is simply a recognition that a free society neither requires, nor countenances, the creation of

19. *See, e.g.,* Affidavit of Jonathan Lash, Staff Attorney for the Natural Resources Defense Council 4 (Mar. 29, 1983), *reprinted in* II J.A. 336 ("If NRDC was excluded from future Combined Federal Campaigns, it will be extremely difficult for us to reach the federal employee audience, and because of the costs of direct mail, a much greater proportion of revenue will have to go to fund raising activities, with the result that a smaller proportion of the organization's resources will be used for its program.").

vast enclaves in which one is permitted to speak only at the fancy of the Government.

The dissent obviously takes a very different view of the First Amendment. It proclaims that the Amendment is the "basic bulwark of our liberty," but proceeds to make a mockery of this declaration by advocating a "test" which arbitrarily and unreasonably removes the workplaces of millions of Americans from the Amendment's protection. We need not respond at length to the views expressed in this dissent. For the most part, it is sufficient for us simply to note that the test it advocates completely disregards any value of the First Amendment, and the "facts" it analyzes are totally removed from those actually before us.

The dissent begins—as it must—by acknowledging that *Perry* requires that distinctions between speakers in "nonpublic forums" be *reasonable. See Perry Education Association v. Perry Local Educators' Association,* —— U.S. ——, 103 S.Ct. 948, 957, 74 L.Ed.2d 794 (1983). *See also United States Postal Service v. Council of Greenburgh Civic Associations,* 453 U.S. 114, 131 n. 7, 101 S.Ct. 2676, 2686 n. 7, 69 L.Ed.2d 517 (1981). It then inexplicably ignores its own words by applying a *rational basis* test. Although the dissent does not deem it necessary to explain what this *does* require the Government to establish, it is quite emphatic in its enumeration of what is *not* required of the Government:

(1) the Government's distinction need not further a significant Government interest (Dissenting Opinion at 1274);

(2) the Government need not produce any evidence that the asserted interest will be advanced (Dissenting Opinion at 1275);

(3) a Government prohibition of otherwise protected speech is justified when it is in response to the protestations of potential listeners (Dissenting Opinion at 1277–1280);

(4) the existence of less restrictive means to advance the Government's interest is irrelevant (Dissenting Opinion at 1275); and

(5) the fact that the Government is motivated by a desire to suppress a speaker, or even a speaker's view, is irrelevant if the Government can point to some rational basis for its treatment of the speaker (Dissenting Opinion at 1281 n. 48).

This is an extraordinary view of the protection afforded by the "basic bulwark of our liberty." The word "reasonable," as used by the Supreme Court in *Perry,* has been rendered meaningless by the dissent. We do not have the slightest doubt that *any* Government restriction on speech would survive scrutiny under the so-called deferential test enunciated by the dissent. Indeed, the dissent seems to embrace a notion that any Government prohibition of First Amendment activity is by definition rational because it is an act of the Government. In advocating such an approach, the dissent has simply chosen to ignore the clear teachings of *Perry.*

The dissent's defense of the Government's differential access policy is predicated on its unquestioning acceptance of the Government's characterization of this policy. The dissent repeatedly labels the charities included in the CFC as noncontroversial, "traditional charities," while labeling the excluded LDFs as "political advocacy groups"; it therefore has little trouble finding a rational basis for the Government's policy. This is a gross oversimplification of the policy that is really at issue in this case, and disregards the undisputed facts about the organizations that *actually participate* in the campaign.

By acquiescing in the Government's abstractions, the dissent offers no explanations for the real distinctions that are being made by the Government. The dissent does not tell us why LDFs can reasonably be considered "advocacy" groups, while legal aid societies are not. It does not tell us why affording employees an opportunity to contribute to LDFs is unacceptably controversial, while differential treatment of groups providing abortion counseling is not. Nor does it explain how the sports and recreation societies—which Dr. Devine said have no place in a charity drive—better provide for the essential needs of the hungry, sick and ignorant, than organizations

dedicated to the protection of basic legal rights.

Content to rely on Dr. Devine's self-serving and inaccurate characterizations of the CFC, the dissent proceeds to consider whether a justification can be found for treating "traditional charities" differently than "advocacy groups." Given the tenuity of the test it employs, one should not be surprised to find the dissent persuaded by *every* justification raised by the Government during its three year effort to exorcise LDFs from the CFC. Even more revealing is the dissent's unqualified acceptance of justifications that either *were not even mentioned* by the Government until this litigation was commenced or were *expressly repudiated* by the Government.

We have already elucidated the obvious shortcomings in these justifications; some final observations are now in order. First, the dissent's consistent references to LDFs as "political advocacy groups" implies a difference between the activities of LDFs and other charities that simply ignores reality. *See* Devine testimony, *supra,* at 52, 53, *reprinted in* II J.A. 420, 421 (arguing that it is "perfectly appropriate" for charities to "lobby or otherwise present their views on issues that relate to their interests"). Even the dissent appears uncomfortable with the implication that "real" charities transcend advocacy, since it makes no serious attempt to argue that "political advocacy" is even a rational basis for distinguishing LDFs from the charities included in the CFC. Instead, the dissent unconvincingly attempts to salvage its position by asserting that the Government will appear less political if LDFs are excluded. The Supreme Court's "nonpublic forum" cases have never suggested that restrictions on *nonpolitical* speech can be justified by the baseless complaints of some listeners that the Government is being political. We can only express our amazement at the dissent's claim that unreasonable distinctions between speakers—*imposed simply to appease pro-*

*testing listeners*—will somehow make the Government seem *less* political.

The dissent's discussion of the "controversial nature" of LDFs is equally disturbing. The dissent conveniently ignores the fact that only *designated* contributions are at issue in this case. It does not explain why affording employees the *opportunity* to contribute to LDFs will prove as "controversial" as the possibility that employees might *unwittingly* support them through undesignated contributions. Even more fundamentally, the dissent's discussion reveals its willingness to allow the reaction of an audience—*no matter how unworthy its basis* —to define the scope of First Amendment activity. Whether the cause of this reaction be racial hatred, religious bigotry, or otherwise, in the dissent's view the Government acts wisely when it responds by silencing the speaker.[20]

Nothing more need be said of this dissenting opinion. The dissent has simply attempted—by advocating an astonishingly narrow construction of the First Amendment and by refusing even to question the Government's assertions of interest in this case—to make the First Amendment a nullity in that part of the public domain that it considers the "nonpublic forum." The Constitution does not envision such pockets of tyranny, and we unqualifiedly repudiate the dissent's attempt to create them.

### CONCLUSION

Although the Government has substantial latitude in regulating speech on property falling within the third category delineated in *Perry,* this regulation cannot discriminate between speakers absent some reasonable justification for doing so. In this case, the Government has permitted hundreds of charities to make unobtusive appeals to Federal employees through the CFC, and has thereby facilitated its employees' awareness of a broad range of options for their charitable support. Our review of the

---

**20.** This is tellingly evidenced by the dissent's characterization of a letter which warns of "groups that stir up negative feelings because of religious ... affiliation," as "contain[ing] much wisdom." Dissenting Opinion at 1279 n. 35. *See* Letter from Sidney M. Ford to Donald Devine (Jan. 12, 1983), II J.A. 487, *reprinted in* Dissenting Opinion at Addendum B.

multifarious and shifting explanations advanced by the appellant reveals no reasonable basis for denying the appellees the same opportunity. Instead, it most strikingly reveals the appellant's steadfast desire to find some way to exclude LDFs, while including charities that he viewed more favorably. The First Amendment does not tolerate discrimination of this sort by the Government.

Judge Wright is in complete agreement with this opinion, but would reach the issue that we find unnecessary to decide: whether the CFC constitutes a limited public forum. He would hold that it does, and would affirm the District Court's decision because the applicable First Amendment requirements have not been satisfied.

The District Court's decision is affirmed. As ordered by the District Court, the appellant, his agents and subordinates, are permanently enjoined from excluding the appellees from participation in the Combined Federal Campaign with respect to the solicitation of designated contributions on the basis of the provisions of section 2(b)(1 through 3) of Executive Order 12,353, as amended by section 1(b) of Executive Order 12,404.[21]

*So ordered.*

STARR, Circuit Judge, dissenting:

Western philosophers, theologians, and statesmen of widely varying viewpoints have affirmed for over two thousand years that charity—the feeding of the hungry, the healing of the sick, and the educating of the ignorant—has a claim on the human conscience that transcends political differences. In response to this ancient claim, the federal government conducts an annual charitable drive among federal employees known as the Combined Federal Campaign.

Like those private employers which conduct similar drives, the federal government has a legitimate interest both in minimizing the time devoted by its employees to the charitable campaign and in preventing the campaign from disrupting the workplace. As a provider or financier of welfare and health benefits, the government, unlike private employers, has a profound and direct interest in the success of this charitable drive, for what the needy receive from charity they will not require from government.

The majority's decision today to mandate the federal charitable campaign's inclusion of advocacy groups—non-profit, tax-exempt organizations engaged in the pursuit of policy goals through litigation—distorts the nature of charity. The results of this exercise of judicial power not only threaten the success of the federal charitable drive, but impose as well unnecessary burdens on the federal resources required to conduct it. If the law required this unhappy result, I would suppress my own misgivings about the wisdom of the decision and stoutheartedly join the majority. But today's decision is compelled neither by the Constitution nor by relevant decisions of the Supreme Court. In fact, as I will seek to demonstrate, the majority's decision is at war with the law of the First Amendment.

To foreshadow the discussion to come, the bedrock distinction between a "public forum" and "nonpublic forum" in First Amendment law—a pivotal distinction avoided by the majority's analytical legerdemain—is designed to prevent that basic bulwark of our liberty from irrationally transforming the nature of a facility which is devoted to purposes *other* than public discourse and debate. We are dealing here not with a street or park or other gathering place for exchange in the marketplace of

---

**21.** The appellant's objections to the District Court's order are frivolous and merit only a brief response. As the Government has chosen to impose time, place, and manner requirements dictating that charitable solicitation in Federal facilities be conducted through the CFC, and it is only the unreasonable exclusion from the CFC pursuant to Executive Order 12,404 that is at issue in this appeal, it was completely appropriate for the District Court to enjoin exclusion from the CFC on the basis of the executive order as a remedy. The appellant's suggestion that the appellees should instead be permitted to make direct, personal appeals in the workplace, not only goes beyond what is at issue in this case, but is hopelessly inconsistent with the appellant's professed concerns about disruption and controversy in the workplace.

ideas. This is the federal workplace. And while the majority's approach does not directly challenge the proposition that a federal charitable campaign conducted in the federal workplace constitutes a "nonpublic forum" under applicable First Amendment analysis, the majority, in striking down the limitations at issue here, employs a stringent standard of review under the guise of a "reasonableness test" that comports not at all with the deferential standard demanded by Supreme Court precedent. In a word, much of the majority's analysis is inapplicable to the case at hand.

Furthermore, the majority seems to overlook the fact that this case comes before us on the advocacy groups' motion for summary judgment. Far from reading the evidence in the light most favorable to the government, the majority in fact blinks at substantial evidence in this record that would support the restrictions at issue here even in the face of more searching judicial scrutiny than governing case law warrants. Inasmuch as the government has presented ample evidence in support of the challenged restrictions to survive a summary judgment motion testing their reasonableness, I respectfully dissent.

### I.

### A.

The standards for measuring government-imposed limitations upon First Amendment access to public property differ depending upon the nature or character of the property at issue.[1] *Perry Education Association v. Perry Local Educators Association,* —— U.S. ——, 103 S.Ct. 948, 74

L.Ed.2d 794 (1983). Judicial review is most exacting when the place to which access is sought is categorized as a "public forum." Governmental restrictions on access to a public forum will be upheld only if the limitations are "necessary to serve a compelling state interest and ... [are] narrowly drawn to achieve that end." *Id.* The standard of review is also stringent when a "limited public forum" is at issue; however, such a forum may legitimately be limited to the use of groups or the discussion of subjects for which the forum was created in the first instance. *Perry,* 103 S.Ct. at 955 n. 7. In contrast, the standard of judicial review for limitations on access to a "nonpublic forum"[2] is considerably more deferential. Such restrictions will be upheld so long as they are "reasonable" and are "viewpoint neutral," which is to say that the restrictions are "not an effort to suppress expression merely because public officials oppose the speaker's view." *Perry,* 103 S.Ct. at 955.

The paradigm instances of a public forum are streets and parks—traditional places for public assembly and expression. *See United States Postal Service v. Council of Greenburgh Civic Associations,* 453 U.S. 114, 101 S.Ct. 2676, 69 L.Ed.2d 517 (1981) (citing, *e.g., Hague v. CIO,* 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423 (1939)). Other forums deemed "public" for First Amendment purposes are university meeting facilities, *see Widmar v. Vincent,* 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981) and municipal theaters, *see Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975).[3] On the

---

1. The government also argues that because the CFC represents a government subsidy to charity, the exclusion of certain organizations from the enjoyment of the fruits of the CFC is to be tested under the equal protection clause rather than the First Amendment and is permissible under the analysis of a recent Supreme Court decision, *Regan v. Taxation with Representation,* —— U.S. ——, 103 S.Ct. 1997, 76 L.Ed.2d 129 (1983). In view of my conclusion that the CFC is a nonpublic forum and that the restrictions meet the "reasonableness" test for public forums under the First Amendment, I do not reach the government's argument under *Regan.*

2. *Perry* is the first Supreme Court case to use the term "nonpublic forum." 103 S.Ct. at 957. *See also* note 3, *infra,* as to "limited public forums." Previous cases simply stated that a particular place was not a public forum. *See, e.g., United States Postal Serv. v. Council of Greenburgh Civic Ass'ns,* 453 U.S. 114, 128, 101 S.Ct. 2676, 2684, 69 L.Ed.2d 517 (1981).

3. *Perry* characterizes *Widmar* and *Conrad* as "limited public" forums although those cases themselves characterized the forum under review simply as "public." Indeed, *Perry* is the first Supreme Court decision to introduce and

other hand, the Court has held that a school's internal mail system, *see Perry, supra;* postal mailboxes, *see Greenburgh, supra;* military bases, *see Greer v. Spock,* 424 U.S. 828, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976); and advertising panels in rapid transit vehicles, *see Lehman v. Shaker Heights,* 418 U.S. 298, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974) (plurality opinion), are not public forums.

These cases clearly indicate that no bright-line test exists to distinguish between public and nonpublic forums. Instead, the Supreme Court cases analyze the nature of the particular facility in question and determine whether the forum is "public" or "nonpublic" in light of three factors. *First,* the Court analyzes the history of the facility to determine whether the public has traditionally used the place as a forum for expression of views. *See Greer v. Spock, supra,* 424 U.S. at 838, 96 S.Ct. at 1217 ("The notion that federal military reservations, like municipal streets and parks, have traditionally served as a place for free pub-

lic assembly and communications of thoughts by private citizens is thus historically and constitutionally false").[4] *Second,* the Court has looked to the capacity in which the government is operating the forum. The Court is less likely to determine that a public forum exists when the government is operating the facility or installation in the role of employer; *see Greer v. Spock, supra,* 424 U.S. at 830, 838, 96 S.Ct. at 1213, 1218 (emphasizing that military bases are used for the training of personnel); or a commercial venturer, *see Lehman, supra,* 418 U.S. at 303, 94 S.Ct. at 2717 (emphasizing that in running a rapid transit service the municipality was operating as a commercial venturer); *Greenburgh, supra,* 453 U.S. at 127, 101 S.Ct. at 2684 (emphasizing the commercial nature of the postal service).[5] *Third,* and finally, the Court inquires into whether the government permits the forum to be used "indiscriminately" by the public. *See Perry,* 103 S.Ct. at 956.[6]

discuss the concept of a "limited public forum," although in one prior case a forum was simultaneously characterized as a "public forum" and a "limited public forum." *See Heffron v. International Body for Krishna Consciousness,* 452 U.S. 640, 655 & n. 16, 101 S.Ct. 2559, 2568 & n. 16, 69 L.Ed.2d 298 (1981).

4. *See also Greenburgh,* 453 U.S. at 120, 101 S.Ct. at 2680 (quoting Justice Holmes' aphorism that "a page of history is worth a volume of logic") (citation omitted); *Lehman,* 418 U.S. at 302, 94 S.Ct. at 2716 (quoting Lord Dunedin's statement that "the truth is that open spaces and public places differ very much in their character, and before you could say whether a certain thing could be done in a certain place you would have to know the history of the particular place").

Determining whether the forum has been used for public discourse helps the court in several ways in deciding whether strict scrutiny of restrictions on access to the forum is appropriate. First, if the forum is one in which speech has traditionally flourished, there is little danger that stringent judicial review resulting in greater "speech" of some kind will alter the nature of the forum. However, the relative absence of public discourse in a forum suggests that it has a *bona fide* purpose other than communication. Second, restrictions on traditional forums may cut off crucial public debate, because such restrictions prevent people from

expressing themselves in places upon which they have reasonably come to rely for public expression. If, however, the forum is not traditionally given over to public discourse, the restrictions will cause no displacement of speech, and the existence of traditional forums will provide the public with obvious alternative venues. Finally, the judiciary has great experience in dealing with traditional forums like parks and streets. However, it may be thought to possess less expertise concerning the nature of nonpublic forums. Therefore, a standard of review which gives more deference to the other branches of government that operate such forums would seem entirely appropriate.

5. Considering the capacity in which the government is operating the forum is also useful in determining the level of First Amendment scrutiny. If the government is operating the forum for the use of the public, strict scrutiny is, under binding precedent, reasonably required to ensure that the public in fact has access to the facility. However, when the government is operating a facility as a commercial venturer or employer, it is performing functions to which the public in general has no expectation of access.

6. If the forum is in fact being used indiscriminately by the public, there seems no reason to suspect that the introduction of more speakers will change the nature of the forum. *See also* note 4 *supra.*

## B.

The threshold question in this case, which the majority chooses not to address, is how to characterize the forum at issue here in accordance with the Supreme Court's teaching, as set out above. The government argues that the forum at issue is the federal workplace in which the campaign takes place. The advocacy groups argue, in contrast, that the forum should be viewed as the Combined Federal Campaign, as embodied in the standardized pamphlet listing charitable organizations which is circulated to employees throughout the federal workplace. While the Supreme Court has never squarely addressed a similar problem, this court recently resolved a similar issue in *United States-South West Africa/Namibia Trade & Cultural Council v. United States,* 708 F.2d 760 (D.C.Cir.1983) [hereinafter cited as *Namibia*]. In that case, the district court in its public forum analysis had focused solely upon the advertising display cases at National Airport, disembodied from the airport terminals in which the displays were situated. In reversing the district court, this court stated that the analytical focus upon the display cases alone was unduly "narrow." To "appraise accurately" whether the forum is public or nonpublic, the court concluded that it had to evaluate the advertising panels in the context of the airport of which they were a part. *Namibia,* 708 F.2d at 784.

In my view, this approach—analyzing the communicative medium in the larger context of the place in which the facility exists—is supported both by Supreme Court precedent and the rationale of the public forum doctrine. As the *Namibia* court itself noted, focusing on the larger context "parallels the Supreme Court's consideration of the functions and physical limitations of the buses at issue in *Lehman*." *Namibia,* 708 F.2d at 764 (citation omitted). Furthermore, in deciding that political speakers had no right of access to a *public area* on a military base, the Supreme Court analyzed that area in the context of the history and traditions of the military base as a whole. *See Greer v. Spock, supra.* Both in *Lehman* and *Greer,* therefore, the Court eschewed an artificial, piecemeal analysis in determining precisely the metes and bounds of the forum in question.

*Namibia* is entirely consistent with this common-sense approach. Moreover, because the public forum doctrine involves an analysis of property and facilities in order to determine the appropriate level of scrutiny for restrictions on access, it would be anomalous to analyze the communicative medium—such as an advertising display panel in an airport terminal or on a bus—without reference to the place in which it exists. The fact that an advertising display panel is situated on a bus rather than in a park or publicly owned property abutting a street is highly relevant to an evaluation of government-imposed restrictions on access to the advertising panel.

The anomaly of ignoring the larger place within which the medium for communication is situated would be particularly glaring in cases where, as here, the communicative medium is inseparable from the place in which it is situated. The CFC pamphlets are circulated only within the federal workplace. So too the solicitations by federal workers on behalf of the CFC occur only within the federal workplace. It is therefore to the federal workplace to which we must initially look to decide whether a public or nonpublic forum analysis is appropriate.

The federal workplace in which the CFC takes place, both military and civilian, bears little resemblance to a public street or park, places that the Supreme Court has found to be paradigms of the public forum. Indeed, as we have already observed the Supreme Court in *Greer v. Spock* specifically held that the federal military workplace—the military base—is a nonpublic forum. The Court reasoned that there is no history or tradition of public expression at a military base. It stated that "it is ... the business of a military installation like Fort Dix to train soldiers, not to provide a public forum." *Greer v. Spock,* 424 U.S. at 838, 96 S.Ct. at 1217.

This reasoning, in my view, applies just as readily in the setting of the civilian workplace. It is the business of the federal civilian workplace to attend to the myriad interests and duties of government, not to provide a public forum for First Amendment communication. Not surprisingly, therefore, the federal workplace has not traditionally served as a place for public assembly or communication of ideas among private citizens. Public debate and discussion of United States foreign policy, for example, are at the core of First Amendment concerns, but that debate and discussion between private citizens need not be permitted in State Department offices at Foggy Bottom.

The Supreme Court has suggested repeatedly in *dicta* that public institutions such as the federal workplace, whose primary mission lies other than in serving as forums for communication, are simply not public forums. "Were we to hold to the contrary [*i.e.,* that the forum at issue was public], display cases in public hospitals, libraries, *office buildings,* military compounds, and other public facilities would become Hyde Parks open to every would-be pamphleteer and politician. This the Constitution does not require." *Lehman, supra,* 418 U.S. at 304, 94 S.Ct. at 2718 (plurality opinion of Blackmun, J.) (emphasis added).[7] The presence of security personnel and sign-in sheets throughout the federal workplace powerfully attest to the undisputed fact that, in a word, the offices of the Department of State or the Department of Defense are not public parks surrounded by walls and ceilings. They are places to which the general public, even for First Amendment purposes, is not automatically permitted to enter simply to exercise constitutional rights.

### C.

The advocacy groups contend, however, that the federal government's introduction of a charitable drive in the federal workplace creates a public forum, albeit of a limited nature.[8] There is absolutely no evidence in this record, however, suggesting any tradition that a charitable drive conducted in an employer's workplace is open to the public. Nor is any evidence of such a tradition likely to exist. To the contrary, a letter from the chairman of the Board of Governors of the United Way of America, a charity invariably included in both public and private employer charitable drives, makes it crystal clear that charitable endeavors in the workplace have depended upon the agreement of government, industry, and labor to put aside political differences; as the letter aptly states, the inclusion of groups engaged in pursuing political or policy goals endangers that long-standing "social compact."[9] From the evidence in this record, in short, it seems abundantly clear that employers have traditionally not

---

**7.** This *dicta* is reaffirmed in *Perry, supra,* 103 S.Ct. at 957–58 n. 9 and *Greenburgh, supra,* 453 U.S. at 130 n. 6, 101 S.Ct. at 2685 n. 6. Indeed, even where the government facility in question is an office whose purpose is to disseminate information, such as an Office of Public Affairs, it has never been the law that free, unimpeded access must be permitted to such offices on the part of the general public, or that only carefully crafted and narrow time, place or manner restrictions on access would be constitutionally permissible.

**8.** The advocacy groups claim that they should be able to participate in the CFC on the same terms as any other group.

**9.** *See* Letter from Donald V. Seibert, Chairman, Board of Governors, United Way of America to the President of the United States (Sept. 15, 1982) ("The implications of these actions by organized labor [in threatening a boycott of the campaign] can and do extend beyond the Combined Federal Campaign. Until now, in the case of charity, leaders of government, industry, and labor have been able to put aside differences between them on other matters. They have come together at the workplace in a social compact to assist the less fortunate in our society through support of charitable endeavors such as the Combined Federal Campaign as well as the annual nationwide United Way Campaign. To jeopardize that compact appears clearly to run contrary to the national interest and the goals of your administration."). I J.A. 99. A copy of this letter is attached to this opinion as Addendum A.

opened their charitable drives to any public group that wishes to participate.[10]

Moreover, the government, as represented by six different Administrations, has never voluntarily included advocacy groups in the federal campaign, let alone every group that wishes to appeal to federal workers for funds. President Kennedy's 1961 Executive Order initiating the Federal Charitable Campaign limited participation in the campaign to "national voluntary health and welfare agencies and such other[s] ... as may be appropriate." Exec. Order No. 10,927, § 2(a), 3 C.F.R. 454 (1959–1963 compilation). There is *undisputed* evidence in the record that this language was understood to limit participation in the campaign to charities that provided traditional health and welfare services to the needy, not organizations devoted to legal advocacy in pursuit of various notions of public policy.[11] This understanding was codified in a government manual governing the conduct of the campaign: it limited participation to organizations "providing direct services to persons in the fields of health and welfare services."[12] Only after the federal district court for this District in *NAACP Legal Defense and Educational Fund, Inc. v. Campbell,* 504 F.Supp. 1365 (D.D.C.1981), invalidated this provision as unacceptably vague under the First Amendment did the government allow advocacy groups to participate.[13] The advocacy groups thus entered the CFC only as a direct consequence of a lawsuit contested by the government. On this record, it is clear beyond doubt from the two-decade history of the campaign that the government is seeking to return the CFC to the traditional contours within which it has always operated. This, then, is not a case of the government's trying to close the barn door after voluntarily allowing the horse to gallop away.

Moreover, *Perry* plainly means that a traditionally nonpublic forum is not transformed into a public forum, limited or otherwise, by the government's conferring selective access to the facility on the part of certain groups. The Court in *Perry* specifically rejected the contention that use of the internal school mail system by the Cub Scouts and similar groups turned the mail system into a public forum or limited public forum, since such selective access did not

---

10. In part II.A. below, I will discuss the relevance of the *status* of advocacy groups as tax-exempt charitable organizations.

11. *See* Testimony of Donald Devine, Director of OPM, before the Subcommittee on Manpower and Housing of the Committee on Governmental Operations of the U.S. House of Representatives (Mar. 24, 1983) ("Everyone seemed to understand that the Combined Federal Campaign was intended to support the traditional kinds of charities that undertake research into the causes and cures of dread diseases or that render health and welfare services directly to needy people. The world of not-for-profit organizations had always included many other kinds of groups and institutions, of course, ranging from private schools and universities to opera guilds, sports associations, recreation societies, and many more, including the newer "advocacy groups" such as legal defense funds and public policy research organizations, all of which number today in the many tens of thousands. But it had never been thought appropriate—and certainly not practical—for these kinds of institutions to participate in the Combined Federal Campaign, especially since they were not engaged in supplying health and welfare services directly to human beings who were ill, infirm, poor, or distressed, thereby

lessening the burdens of government in meeting such needs."). II J.A. 385–86.

12. *Manual on Fund-Raising Within the Federal Service* § 5.21 (1977) (U.S. Government Printing Office No. 006–000–01024–5).

13. In *Campbell,* the district court impliedly premised its strict First Amendment scrutiny on the proposition that CFC was a public forum. 504 F.Supp. at 1367. I respectfully disagree with the learned district judge's conclusion in this respect. But in any event, it is clear that the government's alteration of the contours of the campaign in response to a decision declaring the campaign to be a public forum should not be taken into account in deciding whether the campaign is a public or nonpublic forum.

Lest there be any misapprehension as to the significance of the fact that no appeal was maintained in *Campbell,* the Supreme Court has recently reminded us, in a unanimous opinion, that decisions by the Solicitor General to appeal or not to appeal are governed by a variety of factors which would not necessarily obtain as to a private litigant. *United States v. Mendoza,* —— U.S. ——, ——, 104 S.Ct. 568, 571, 78 L.Ed.2d 379 (1984).

amount to "indiscriminate use" by the general public. 103 S.Ct. at 955–956.[14] Certainly the Combined Federal Campaign is not and never has been used indiscriminately by the public, nor is the public allowed indiscriminate access to the federal workplace.

As indicated above, the government does not circulate all appeals from the public in the CFC but only those from certain traditional health and welfare organizations generally included in an employer's charitable drive. Furthermore, the "speech" permitted to the charitable groups is strictly limited in ways that clearly prevent any possible claim of indiscriminate access. First, the CFC allows the pamphlets to be circulated once a year for six weeks. 5 C.F.R. § 950.103 (1983). Second, the statements are limited to thirty-word descriptions of the nature of the program. 5 C.F.R. § 950.521. These materials must not contain "distractions that compete for the contributors' attention," 5 C.F.R. § 950.-521(d) and "must have the approval of the local Federal Coordinating Committee."[15] 5 C.F.R. § 950.521(a). The charitable group is not permitted to make any spontaneous or personal appeal of its own; to the contrary, federal workers circulate the pamphlets and make any follow-up solicitations.

These strict limitations on speech conclusively establish that the CFC, as conducted and regulated in the federal workplace, resembles not at all the public forums that "have been used for the purpose of assembly, communicating thoughts between citizens, and discussing public questions." *Hague v. CIO, supra,* 307 U.S. at 515, 59 S.Ct. at 964.

## II.

### A.

Once the forum is categorized as nonpublic, the restrictions on access must be upheld if they are both reasonable and neutral as to the viewpoint espoused by the "speaker." *Perry,* 103 S.Ct. at 955. The Supreme Court's decisions make it abundantly clear that the standard of "reasonableness" is deferential, giving substantial weight to judgments of those familiar with the nature of the forum—an approach far removed from that employed by the majority.[16] In none of these cases was the government required to produce a "compelling" or "significant" governmental interest[17] to justify the restrictions. To the contrary, the government must simply provide a "rational basis" for its exclusion of certain organi-

---

**14.** *See also Greer v. Spock, supra,* 424 U.S. at 838 n. 10, 96 S.Ct. at 1217 n. 10 (1976) ("The fact that other civilian speakers and entertainers had sometimes been invited to appear at Fort Dix ... surely did not leave the authorities powerless thereafter to prevent any civilian from entering Fort Dix to speak on any subject whatever.").

**15.** Such restrictions on expression are difficult to characterize as time, manner and place regulations but would normally be classified as prior restraints under traditional First Amendment analysis. If the CFC is categorized as a limited public forum with the stringent First Amendment scrutiny which that categorization implies, such regulations would likely not survive. *See, e.g., New York Times Co. v. United States,* 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971) (discussing the heavy presumption against prior restraints). Thus, categorization of the CFC as a public forum may endanger other regulations of the campaign, thereby radically altering its nature. Perhaps the majority's silence on the precise nature of the CFC in the federal workplace is the better part of valor

in light of the havoc which would inevitably be wrought by applying a limited public forum analysis.

**16.** Commentators have noted the deferential standard applied to nonpublic forums. *See, e.g., Note, A Unitary Approach to Claims of First Amendment Access to Publicly Owned Property,* 35 Stan.L.Rev. 121, 127 (1982) (characterizing "scrutiny" of nonpublic forums as "weak"); Cass, *First Amendment Access to Government Facilities,* 65 Va.L.Rev. 1287, 1303 (1979) (noting that the Supreme Court grants little protection to speech when the place has been characterized as a nonpublic forum). Indeed, it would seem pointless to go to the trouble of distinguishing between public and nonpublic forums only to employ a stringent scrutiny analysis to restrictions of access to both types of facilities.

**17.** *See Greenburgh, supra,* 453 U.S. at 131 n. 7, 101 S.Ct. at 2686 n. 7 (rejecting the "significant governmental interest" test advanced by Justice Marshall in dissent).

zations from the nonpublic forum.[18] Nor has the Court engaged in the "least restrictive alternative analysis" to strike down restrictions in a nonpublic forum.[19] Indeed, in *Greenburgh, supra,* 453 U.S. at 132, 101 S.Ct. at 2686, the Court refused to be drawn into balancing the interests of the civic association in using the mailboxes at issue there as against the interests of the government in restricting mailbox access—a task in which the lower court had engaged at length. The Court made it clear that the standard of review applicable to content-neutral time, place and manner regulations did *not* have to be met in the case of restrictions on access to a nonpublic forum.

Moreover, in several cases the Court has not required the government to produce evidence of dangers against which the government-imposed restrictions on access are to be aimed. The judicial deference evidenced in those cases is particularly noteworthy in divining the appropriate standard of review in the instant case, because the dangers against which the restrictions upon CFC participation are aimed are strikingly similar. For instance, when in *Perry* the school system alleged that allowing a union which was a rival to the incumbent bargaining agent to use the school's internal mail system would disrupt the school, the Court specifically stated that it would require no proof of the possibility of disruption. *Perry,* 103 S.Ct. at 959 n. 12.[20] Similarly in *Lehman,* the worthies of Shaker Heights produced no evidence whatever, nor were they required to, to justify the contentions that allowing paid political advertisements would endanger long term transit revenues and that such advertisements would create "lurking doubts about favoritism" on the part of city authorities. 418 U.S. at 304, 94 S.Ct. at 2718.

In particular, the majority dramatically departs from this body of prior case law when it in effect steps up the standard of judicial review by virtue of the fact that advocacy groups have the same *status* under the Internal Revenue Code as traditional health and welfare organizations. The tax laws were not drafted with the conduct of charitable campaigns in the federal workplace in mind. With due respect both to the majority and to the tax laws, the Internal Revenue Code may well be of abid-

---

**18.** *See Jones v. North Carolina Prisoners' Labor Union, Inc.,* 433 U.S. 119, 134, 97 S.Ct. 2532, 2542, 53 L.Ed.2d 629 (1977).

**19.** Indeed, in some nonpublic forum cases less restrictive alternatives have been suggested only to be ignored by the Court. *See, e.g., Lehman, supra,* 418 U.S. at 321, 94 S.Ct. at 2726 (suggesting that the "impression of city endorsement can be dispelled by requiring disclaimers to appear prominently on the face of every advertisement").

In this regard, the majority's postscript advances the view that under this analysis, "*any* Government restriction on speech would survive scrutiny under the so-called deferential test enunciated by the dissent." Majority Op. at 1266 (emphasis in original). In rather heated terms, the majority takes umbrage with what is, in fact, a straight-forward analysis of governing precedent. After all, *Jones* flatly holds that the burden on the government in nonpublic forum cases is "only [to] demonstrate a *rational basis* for their distinctions between organizational groups." 433 U.S. at 134, 97 S.Ct. at 2542 (emphasis added).

The majority's *sturm und drang* approach is misplaced. While judges should refrain from rendering advisory opinions, I have no difficul-

ty at all in suggesting that, for example, the government's elimination from the CFC of only those charitable groups that assist members of discrete and insular minority groups would plainly run afoul of *Perry*'s analysis. So would any exclusion based upon disagreement with the views or positions of the particular charitable organization, under the viewpoint-neutrality analysis set forth below. The majority therefore need not lose any sleep over concern that *Perry* ushers in an era of utterly unbridled discretion on the part of government officials. Neither *Perry* nor anything in this opinion, dispassionately read, suggests anything of the sort.

**20.** The Court's refusal to require evidence of disruption cannot be explained away as an instance of its extraordinary deference to the national interest in labor stability. To justify its refusal to require such evidence, the Court cited another nonpublic forum case, *Greer v. Spock, supra,* which did not require the production of evidence to prove that political speech would disrupt the military workplace. It will not do to tuck *Perry* away in a pigeonhole marked "Labor Relations," and thus drain it of all efficacy outside the employment setting. *Perry*'s locks are not so Samson-like to be so easily lopped off.

ing relevance and interest to taxpayers, but it is breathtakingly irrelevant to whether the government's restrictions on CFC participation are reasonable. It is certainly true that *Perry* emphasized the respective statuses of the union that, as the elected bargaining agent, was allowed to use the internal mailbox, and of the union that, as a mere rival with no collective bargaining responsibilities, was excluded from mailbox access. *But, critically, the Supreme Court has not heightened judicial review in non-public forum cases when there happens to be no difference in legal status between the admitted and the excluded.* In *Greenburgh, North Carolina Prisoners' Union, Greer,* and *Lehman, supra,* the Court did not demand that the groups or individuals treated unfavorably have different statuses as codified in some law like the tax code; rather, ·the Court merely inquired into whether the government had a rational basis for distinguishing between the groups in the context of the forum.

Indeed, *Perry,* insofar as it speaks to the reasonableness of restrictions in a very different kind of nonpublic forum, supports the government's position here. In *Perry,* the Supreme Court emphasized the relevance of private industry practice in evaluating whether there was a rational basis for the differential access given to different groups. 103 S.Ct. at 958 n. 11. The evidence in this record, indicating that private industry admits traditional health and welfare groups but not advocacy groups like appellees into its charitable drives,[21] suggests that the government's distinction is not capricious.

As a practical matter, the majority's invocation of the various organizations' legal status as the linchpin of its constitutional analysis would potentially transform the federal charitable drive into a Babel of competing organizations, once the news goes forth that tax-exempt status, without more, entitles an organization to participate in the CFC. By using tax-exempt status *vel non* as the touchstone for access to government property, the majority seem-ingly opens wide the door to organizations that have not heretofore participated in the CFC. From religious organizations to public policy thinktanks, from museums to universities, the range of tax-exempt organizations is wide and diverse. And it is not at all clear how, under the majority's analysis of reasonableness, principled limitations to exclude any tax-exempt organization can be fashioned. By the judiciary's imaginative use of the First Amendment, the entrance to the federal workplace charitable drive has thus been thrown wide open to any organization that can display evidence of having passed into the safe harbor of section 501(c)(3). Perhaps there is no longer a need for churches to depend exclusively upon giving on Sunday; coupling the majority's analysis with the Supreme Court's holding in *Widmar v. Vincent, supra,* 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440, suggests an attractive new vehicle for the effectuation of ecclesiastical stewardship drives.

### B.

In contrast to the majority's conclusion, the government's showing in this case easily meets the deferential standard enunciated by the Supreme Court for restrictions on access to nonpublic forums. The government identifies three legitimate interests served by limiting access to the CFC so as to exclude advocacy groups. Importantly, the government has adduced substantial and at times overwhelming evidence that those interests will be impaired unless such groups are excluded from the campaign. *First,* the exclusion of legal advocacy groups promotes both the government's general interest in the present and future success of the charitable campaign and the government's specific interest in seeing that a maximum amount of charitable aid goes to the needy. *Second,* the exclusion promotes both the government's interest in minimizing the time the campaign draws away from federal workers' performance of their primary duties and the governmental interest in preventing disruption in the

---

**21.** For a discussion of this evidence, see part I.C., *supra.*

workplace. *Third,* the exclusion aids the federal government in avoiding the appearance of political favoritism.

The government's position on this appeal is, moreover, greatly strengthened by the procedural posture in which this case comes before us. The district court granted summary judgment in favor of the advocacy groups' position that their exclusion from the campaign was an unconstitutional abridgement of First Amendment rights. It is well settled that "the party who defended against the motion for summary judgment [in the trial court] will have the advantage of the [appellate] court's reading the record in the light most favorable to him, will have his allegations taken as true, and will receive the benefit of the doubt when his assertions conflict with those of the movant." *See* 10A C. Wright & A. Miller, FEDERAL PRACTICE AND PROCEDURE § 2761 (1983). The grant of summary judgment is to be upheld only if the record, when reviewed in this light, show "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R. Civ.P. 56(c). Because the government has presented abundant evidence on whether the inclusion of advocacy groups (1) threatens the viability of the campaign, (2) distracts federal employees from their primary duties, and (3) creates the appearance of political favoritism, this court can affirm the grant of summary judgment only by concluding that these three evils are legally irrelevant to the reasonableness of the government's determination to exclude advocacy groups.[22]

It is self-evident that the government has an interest in the success of the CFC.[23] From the evidence in this record, it is manifestly clear that inclusion of the advocacy groups caused both specific losses in the 1983 campaign[24] and threatened the success of the charitable campaign in the years to come. While the amount of contributions measured in constant dollars was un-

---

22. As shown in part II. A., *supra,* the Supreme Court has viewed such considerations as quite relevant to whether a restriction on access to a nonpublic forum is permissible.

With respect to the summary judgment issue, the approach in this case stands in marked contrast to a very recent decision of this court overruling the district court's grant of summary judgment. *See Family Division Trial Lawyers of the Superior Court—D.C., Inc. v. Moultrie,* 725 F.2d 695 (D.C.Cir.1984). In that case, over my dissent, which was grounded on the conclusion that no evidence could sustain a constitutional attack on a voluntary court assignment system, this court showed great solicitousness for permitting a case to be made out by the attorneys-plaintiffs in the face of a motion for summary judgment by District of Columbia officials.

23. The majority seems to doubt that the government can promote the charitable campaign by excluding a class of organizations that pursue controversial and often mutually antagonistic policies. It cites many First Amendment cases which declare that the right to speak cannot be impaired because of the controversial nature of what the speaker has to say. *None of these cases, however, concern what is at issue here—restrictions on access to nonpublic forums.* A nonpublic forum is not designed to promote or even sustain controversial discourse but has other objectives. In this case, the objective is raising money for charity, and the government can legitimately pursue that objective at the expense of diversity of speech. In *Lehman,* 418 U.S. at 304, 94 S.Ct. at 2718, the Court allowed a municipally-owned bus company to refuse political advertisements in favor of "less controversial" advertisements which would not endanger long term revenues, which was the objective of that nonpublic forum.

Moreover, the majority blinks at reality in claiming that the controversial nature of the participation of advocacy groups does not stem from the nature of the groups themselves. *Groups that are promoting or opposing policies like affirmative action or the closed shop are controversial, for the plain reason that the arguments for and against such policies are controvertible in a way that arguments in favor of a policy of seeking a cure for cancer are not.*

24. In the CFC, federal employees are solicited in the late fall of the year for a pledge of contributions that will then be deducted from the employee's paycheck in the following year. Thus, solicitations for the 1983 campaign took place in the fall of 1982. Because all active work on behalf of the 1983 campaign took place in 1982, people writing to the government about the campaign often refer to it as the "1982 campaign." From the dates of their letters, it is clear that they are referring to the 1983 campaign. In quoting their comments, we will not bother to correct their error of appellation.

changed from the previous year,[25] boycotts in several localities caused sharp contribution declines in those areas, thus indicating that inclusion of advocacy groups did in fact cost the campaign money. For example, in Bremerton, Washington a union boycott caused contributions to drop by over twelve percent.[26] Contributions in Dade County, Florida also slipped considerably by virtue of the inclusion of controversial advocacy groups.[27] The Denver campaign reported that contributions from postal workers were down because of a boycott by a craft union.[28] The International Association of Machinists and Aerospace Workers boycotted the campaign nationwide with consequences that defy calculation.[29]

The record, moreover, strongly suggests that without the exclusion of advocacy groups the disruption of the campaign will deepen in the future. These are not cassandrian fears. Uncontradicted evidence indicates that in many localities and agencies the 1983 campaign achieved success only because federal workers involved in the CFC, from local campaign heads to campaign workers, devoted extraordinary time and effort to enlisting and cajoling their colleagues to contribute to the CFC despite the inclusion of advocacy groups.[30] There was evidence that this level of support could not be sustained in the future.[31] The decline in the number of contributors to the campaign was viewed as a distressing signal of possible troubles ahead, representing an erosion of the base on which future campaigns depend.[32] Indeed, in thirteen of the twenty-one largest local CFC's on which information was available, the number of contributors declined.[33] The record further indicates that at least in some localities one important union, the American Federation of Government Employees, was persuaded to stay in the 1983 campaign but promised to boycott future campaigns if advocacy groups were not excluded.[34]

Thus, the government had received a substantial body of information which taken collectively suggested that the CFC faced

25. In nominal terms, contributions rose 3.8% over the previous year. See Affidavit of P. Kent Bailey (June 30, 1983). II J.A. 553. However, since inflation as represented by the consumer price index was 3.9% in 1982, the real increase was nil.

26. See Testimony of Donald Devine, Director of OPM, before the Subcommittee on Manpower and Housing of the Committee on Governmental Operations of the U.S. House of Representatives, March 24, 1983, supra note 11. II J.A. 401. See also Telegram of W.K. Holt to Donald P. Devine (Jan. 11, 1983). II J.A. 482. Mr. Devine also testified that contributions in Cleveland and Colorado Springs fell by over 10 percent and that in Boise, Idaho the drop was nearly 20 percent. Because all inferences must be drawn in the defendant's favor on this summary judgment motion, it should be inferred that these otherwise unexplained drops were caused by the inclusion of advocacy groups.

27. See Telegram from E.T. Stephenson to Donald Devine (Jun. 18, 1983). II J.A. 469.

28. See Letter from Gary L. Packer, MSC Manager/Postmaster to Donald Devine (Feb. 11, 1983). II J.A. 361.

29. See Letter from William Winpisinger, President of International Association of Machinists and Aerospace Workers to IAM members (August 11, 1982). I J.A. 92.

30. See Affidavit of P. Kent Bailey (May 18, 1983). II J.A. 466. Moreover, Members of Congress were drawn into the disputes and proved instrumental in preventing statewide boycotts of the CFC by writing to unions and promising to study possible rule revisions which would exclude groups who have "no place in a broad-based charitable appeal like the Combined Federal Campaign." See Letter of Daniel Inouye, U.S. Senator, et al. to Benjamin Toyama, President of Hawaii Federal Employees Metal Trades Counsel (May 30, 1983). I J.A. 29.

31. See Letter from C. Wayne Hawkins, Chairman of the Dallas-Fort Worth Federal Executive Board to Donald Devine (Jan. 17, 1983). I J.A. 37.

32. The rate of participation in the campaign decreased by approximately 1.1%. See Affidavit of P. Kent Bailey (May 18, 1983). II J.A. 466.

33. See Affidavit of P. Kent Bailey, supra note 32.

34. See Letter from C. Wayne Hawkins, supra note 31; Letter from Theodore D. Wood, Chairman, 1984 Denver Metropolitan Area Combined Federal Campaign, to Donald Devine (Jan. 14, 1983). I J.A. 38.

difficulties in the future. The government should not be held powerless to forestall the serious erosion of future campaigns simply because the campaign did not immediately collapse under the weight of advocacy groups. In Justice Jackson's memorable phrase, the Bill of Rights is not a suicide pact, but neither should it be turned into an instrument for forced self-immolation at more deliberate speed.

These concerns over the campaign's future were widely shared; contrary to the majority's implication, the concerns were in no way limited to the Administration in Washington. Local CFC administrators stated that the inclusion of advocacy groups placed a "stumbling block" in the "path of potential givers" which would give them an excuse not to contribute.[35] The AFL–CIO, while not boycotting the campaign, stated that inclusion of advocacy groups "cannot help but impair the enthusiasm with which trade union members respond to CFC solicitations."[36] The United Way, a seasoned veteran in the ways and means of charitable fundraising, indicated through its na-

tional chairman that the inclusion of advocacy groups threatened the "social compact" between government, industry, and labor which has sustained charitable enterprises across the Nation.[37] Members of Congress expressed concern.[38]

In the face of these uniform and uncontradicted misgivings about the CFC's future, it is wholly unwarranted for the judiciary—the arm of the government intended by the Framers to be the least dangerous branch—to dismiss as unreasonable the remedial actions taken to protect the campaign from the wounds inflicted by an earlier district court decision that was not reviewed on appeal.[39]

The government likewise has an interest in minimizing the amount of time federal employees spend in soliciting their colleagues, for such solicitations are conducted "during duty hours." 5 C.F.R. § 950.103(e). An extra hour spent on fundraising for the CFC is presumably an hour not spent on other government business. The record is replete with evidence that the inclusion of advocacy groups required federal workers

---

**35.** *See, e.g.,* Letter from Sidney M. Ford, Chairman of the Executive Board of Greater St. Louis Missouri to Donald Devine (Jan. 12, 1983). II J.A. 487. This letter contains much wisdom concerning the atmosphere necessary for a successful charitable drive. "When advocacy groups or groups that stir up negative feelings because of religious or union affiliation are present [in a general fund drive], we place an undue stumbling block in the path of many potential givers. There is a growing concern on the part of Federal officials that if the CFC does not remove many of the controversial organizations, dire results will occur. Many people are looking for a chink in the CFC armor, and it happens that by including advocacy groups we play into their hands; and we provide the 'I'll give at home' individual excuse for not participating." This letter is attached to this opinion as Addendum B.

**36.** *See* Statement by the AFL–CIO Executive Council on the Combined Federal Campaign (Aug. 4, 1982). I J.A. 96.

**37.** *See* Letter from Donald V. Seibert, *supra* note 9, and Addendum A.

**38.** *See, e.g.,* Letter from Hon. Claudine Schneider to Donald Devine (Sept. 13, 1982). II J.A. 362.

**39.** As to the significance of the government's not appealing that decision, see note 13 *supra.*

Besides its interest in maximizing revenues for the campaign in general, the government has a specific interest in directing the revenues to the poor and needy, because as the provider of last resort the government is ultimately responsible for the needy. The government has a rational basis for concluding that in general a dollar given to a traditional health and welfare charity will more certainly aid the needy than a dollar given to an advocacy group. The connection between the activities in which advocacy groups engage and aid for the needy is speculative for two reasons. First, the methods by which advocacy groups advance their policies are risky. In the course of litigation, lobbying, or influencing elections an advocacy group may spend a huge sum of money only to lose. Second, the policies such groups advance are often controversial in the sense that opinion is still divided over whether they aid the needy or not. Indeed, since many of these groups have antagonistic aims, it is simply not possible that all their policies are bringing net benefit to the needy. In view of the uncertainty over the effect of advocacy groups' policies on the plight of the needy, the government can rationally choose to exclude them from the CFC.

to spend time persuading unions not to boycott the campaign, explaining to skeptical workers how they could designate funds to avoid giving money to advocacy groups, and trying to help people surmount the psychological and emotional barriers which the inclusion of litigation advocacy groups firmly implanted in the way of charitable giving.[40] In the Portland, Oregon, area alone approximately 2,500 more hours were devoted by Federal employees to soliciting and managing the Portland area CFC.[41] Such an increase in federal employee time spent on the campaign would obviously represent on a national scale a very real and substantial additional burden on federal resources.

While the record does not indicate that any specific contretemps occurred in the workplace because of the advent of advocacy groups into the CFC, facts exist which would, it seems to me, warrant the government's reasonably inferring the possibility of such occurrences. Union leaders denounced the inclusion of advocacy groups in terms reflecting neither detachment nor polite disinterestedness.[42] In at least one locality, pressure groups appeared outside the federal workplace, handing out pamphlets and pressing workers not to give to the CFC.[43]

Finally, the record suggests that the appearance of governmental favoritism toward advocacy groups is a genuine and deep concern. The AFL–CIO, the country's largest labor organization, opened a news release on the 1983 CFC with the following *pronunciamento:* "The Reagan Administra-

tion has granted yet another opportunity to the far right wing to enrich itself, this time at the expense of federal and postal employees and the needy." [44] Others were even less complimentary about the presumed motives inspiring the introduction of advocacy groups into the CFC. One union leader colorfully described the CFC's inclusion of the National Right to Work Foundation as equivalent to inviting Jack the Ripper to an "afternoon tea party for maiden ladies." [45] In contrast to *Lehman* where the Court found that the mere *possibility* of "lurking doubts" of political favoritism was a reason for excluding political advertisements from rapid transit advertising panels, here the record contains the acrid comments of national union leaders who in plain English expressly charged the Administration with politically inspired favoritism.

Of course, just as there is no suggestion in *Lehman* that Shaker Heights was actually parceling out advertising space on the basis of political beliefs, the record indicates that the CFC included in 1983 all advocacy groups that wanted to participate. But actual favoritism need not exist to warrant an exclusionary effort by government. The Supreme Court has recognized a legitimate government interest in avoiding the very appearance of favoritism even when none exists.[46] Indeed, it is highly significant that union leaders who had access to information and were presumably aware of the reasons prompting the inclusion of advocacy groups in the 1983 CFC still attributed the action to partisan motives. Suspicions har-

**40.** *See, e.g.,* Letter of Wayne Hawkins, *supra* note 31; Letter from San Juan Romero, Chairman of the Greater Cincinnati Federal Executive Board to Donald Devine (Jan. 12, 1983) ("Making goal [sic], however, was due primarily to the inordinate amount of official time and effort put into the campaign by everyone concerned. The Federal Government can no longer afford to do this!"). II J.A. 473.

**41.** *See* Letter from M. Eldon Green, Chairman of the Combined Federal Campaign—Portland, Oregon, to Donald Devine (Jan. 18, 1983). II J.A. 486.

**42.** *See* Letter from William Winpisinger, *supra* note 29 and discussion in text *infra* at note 45.

**43.** *See* Letter from Colonel J.W. Small, Director of Defense Mapping Agency (Jan. 19, 1983). II J.A. 471; Letter of Sidney M. Ford, *supra* note 35.

**44.** *See* Statement of AFL–CIO, *supra* note 33.

**45.** *See* Letter of William Winpisinger, *supra* note 29.

**46.** *See, e.g., United States Civil Serv. Comm'n v. National Ass'n of Letter Carriers,* 413 U.S. 548, 565, 93 S.Ct. 2880, 2890, 37 L.Ed.2d 796 (1973).

bored by national union leaders suggest that it may prove difficult indeed to persuade rank-and-file employees of the federal civil service that the inclusion of advocacy groups, particularly one with which an employee happens to disagree, did not occur for political reasons.[47]

### III.

Finally, I turn to the argument, not relied upon by the majority, that exclusion of advocacy groups is not "view-point neutral" and is therefore impermissible even in a nonpublic forum.[48] The President's Executive Order excludes groups which are trying "to influence the outcomes of elections or the determination of public policy through political activity, advocacy, lobbying or litigation on behalf of parties other than themselves . . . ." Exec.Order No. 12,404 § 1(b), 48 Fed.Reg. 6,685 (1983). Since the exclusion operates to prevent groups which are advancing political or policy concerns through certain enumerated means, no matter what those concerns are, appellees cannot plausibly claim that the restrictions on access discriminate on the basis of political viewpoint, as commonly understood. Instead, appellees contend that the order violates "viewpoint neutrality," because it discriminates against groups that choose to promote human welfare by litigation rather than other methods.

*Litigation, however, is generally understood to be a means of obtaining a goal or promoting a viewpoint, rather than a viewpoint itself.* Even if appellees' argument is construed as the claim that they are engaged in advancing the implicit message that litigation is an excellent method of promoting human welfare, Supreme Court precedent demonstrates that restricting such a message does not constitute viewpoint discrimination. For instance, it might well be believed that partisan political activities promote human welfare; yet the Court has upheld restrictions that prohibit public employees from expressing their views on public affairs if the expression is directed toward party success "on the grounds that such restrictions are not aimed at particular parties, groups, or points of view." *United States Civil Service Commission v. National Association of Letter Carriers,* 413 U.S. 548, 556, 93 S.Ct. 2880, 2886, 37 L.Ed.2d 796 (1973). Similarly, some might think that a completely noncensorious approach to materials dealing with human sexuality would promote human welfare; yet the Court upheld zoning restrictions on theaters displaying sexually explicit movies on the grounds that the restrictions "[are] unaffected by whatever social, political, or philosophical message a film may be intended to communicate." *Young v. American Mini Theatres, Inc.,* 427 U.S. 50, 70, 96 S.Ct. 2440, 2452, 49 L.Ed.2d

**47.** Many letters from federal employees attacked the Administration for political favoritism. *See, e.g.,* Letter of Alice Shabecoff to the Combined Federal Campaign (November 22, 1982). II J.A. 370.

The majority opinion argues that the inclusion of an organization like the Olympic Committee makes the exclusion of litigation advocacy groups unreasonable. First, on this record it is impossible to know what the Olympic Committee does with money it received from the CFC. The record is devoid of any evidence whatever as to the scope of the activities of this committee. Second, there is no evidence that the inclusion of organizations like the Olympic Committee causes diminution in charitable revenue, threatens the campaign's future success, distracts employees from their primary duties, and raises doubts of political favoritism in the way that the inclusion of advocacy groups does. Thus, *at least on this record,* the government is reasonable in exclud-

ing advocacy groups and yet not excluding groups like the Olympic Committee.

**48.** Appellees also contend that the exclusion is unconstitutional because it was motivated by a desire to suppress speech. That raw assertion cannot support the judgment below. First, as the government vigorously disputes these characterizations of motivation with supporting record evidence, such an argument cannot form the basis of a decision granting summary judgment. Second, *Perry* suggests that an illicit motivation will not render the restriction unconstitutional so long as the restriction can be justified on objective grounds. "[T]he state may reserve the forum for its intended purpose . . . as long as the regulation or speech is reasonable and not an effort to suppress expression *merely* because public officials oppose the speaker's view." 103 S.Ct. at 955 (emphasis added).

310 (1976) (plurality opinion). In this case, the restriction on the CFC is unaffected by the "social, political, or philosophical message" that groups wish to convey through "advocacy, litigation, or lobbying." As in *Young,* the restriction here is permissible.

### IV.

None of the six Administrations that have conducted the federal charitable drive have voluntarily included advocacy groups. From this record, it appears that private employers generally do not allow advocacy groups to participate in the charitable drives conducted in their workplaces. Local administrators of the CFC from across the Nation attest persuasively to the fact that advocacy groups at a bare minimum befoul the atmosphere needed to conduct a successful charitable campaign. Their comments complain vehemently about the extra burdens imposed upon federal resources by inclusion of litigation advocacy groups. Non-government experts who know firsthand how to appeal to the human wellsprings of charitable giving protest that advocacy groups should not participate in the CFC.

The majority evidently thinks it possesses an expertise which enables it to dismiss this accumulated wisdom from diverse and experienced sources, abundantly documented in the record, and to conclude that the government's restrictions are so blatantly unreasonable that they merit judicial disapprobation without benefit of trial. Convinced that I am not possessed of such expertise, and persuaded that the Constitution neither demands nor warrants today's result, I respectfully dissent.

### ADDENDUM A

September 15, 1982

The President of the United States
The White House
Washington, D.C. 20500

Dear Mr. President:

The Board of Governors of United Way of America, acting through its Executive Committee, has adopted the enclosed Resolution respectfully requesting Presidential action to amend Executive Order 12353 to limit eligibility for the Combined Federal Campaign to charitable agencies providing direct, human-care services in the fields of health and welfare, including health research.

When Executive Order 12353, restructuring the Combined Federal Campaign, was issued on March 23, 1982, there were high hopes in your Administration that it would mark the beginning of a new era of cooperative effort and support for the program's charitable purposes. Certainly, those hopes were shared by the some twenty million dedicated volunteers in United Way organizations across the nation.

Unfortunately, the Executive Order and the implementing regulations issued by the Director, U.S. Office of Personnel Management, have had an opposite and I am sure, unintended affect.

We now find that the Combined Federal Campaign has become a source of intense controversy because of admission to the campaign of organizations whose principal purpose is other than the providing of direct human-care services and health research to persons and families in need of such services.

Illustrative of the controversy is that organized labor, because of the admission to the campaign of the National Right To Work Legal Defense Foundation, now regards the campaign as having departed from its original charitable purpose of support for human-care services. As a result, some unions with hundreds of thousands of members including the National Association of Letter Carriers, have taken the position that the Combined Federal Campaign is no longer deserving of employee support and have directed a boycott of the campaign.

The implications of these actions by organized labor can and do extend beyond the Combined Federal Campaign. Until now, in the cause of charity, leaders of government, industry, and labor have been able to put aside any difference between them on other matters. They have come together at

the workplace in a social compact to assist the less fortunate in our society through support of charitable endeavors such as the Combined Federal Campaign as well as the annual nationwide United Way campaign. To jeopardize that compact appears clearly to run contrary to the national interest and to the goals of your Administration.

Mr. President, on behalf of the more than 37,000 charitable health and welfare agencies that are participating members of United Way, we urge favorable consideration and appropriate action to clarify and amend Executive Order 12353.

Sincerely,
/s/ Donald V. Seibert
Chairman,
Board of Governors
United Way of America

ADDENDUM B

Federal Executive Board

of Greater St. Louis, Missouri

Office of the Director

January 12, 1983

Dr. Donald Devine
Director
Office of Personnel Management
1900 "E" Street, N.W.
Washington, D.C. 20415

Dear Dr. Devine:

The 1982 East-West Gateway CFC raised $1,326,000 which exceeded the 1981 total by $39,000 even though participation declined by approximately four percent.

From the onset it became apparent that this year's drive would be very difficult, especially after 1981's problems with the National Association of Neighborhood Schools (NANS). This year NANS again picketed the Federal buildings; however, after a meeting with their chairman and the CFC chairman they agreed to stop picketing and passing out the handbills. They are still adamant and will no doubt be ac-

tive next year. The threat of boycott by unions was real. Only by hard work were we able to gain their outward support, but many of the rank and file members still reacted negatively.

The steering away from the traditional health and welfare groups could spell the demise of the CFC as we have grown to know it. The loaned executives and key persons must at times face groups of employees who are staunch union members and they must overcome a negative attitude caused by CFC inclusion of advocacy groups.

To be ultimately successful in a general fund drive all agencies must be noncontroversial. When advocacy groups or groups that stir up negative feelings because of religious or union affiliation are present, we place an undue stumbling block in the path of many potential givers.

There is a growing concern on the part of Federal officials that if the CFC does not remove many of the controversial organizations, dire results will occur. Many people are looking for a chink in the CFC armor, and it appears that by including advocacy groups we play into their hands; and we provide the "I'll give at home" individual the excuse for not participating.

We strongly urge the OPM [to] exert maximum efforts to exclude "all" advocacy groups from the 1983 program.

Sincerely,
/s/ Sidney M. Ford
Chairman